# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### April 8, 2003 Session

## ROBERT LEWIS DAVIDSON, Individually and as Administrator of the Estate of Joyce Davidson, Deceased, et al v. CHARLES R. LINDSEY, et al.

### Appeal by permission from the Court of Appeals, Western Section
### Circuit Court for Henry County
### No. 1365     Julian P. Guinn, Judge

---

### No. W2000-02891-SC-R11-CV - Filed May 13, 2003

---

In this personal injury case, we address whether the trial judge properly performed his duties as thirteenth juror in denying the appellees' motion for new trial. The Court of Appeals found that based on statements made by the trial judge during the trial, at the hearing for the motion for new trial, and at the hearing to set bond and stay execution of the judgment, there was "an appearance of bias" against two of the defendants due to their failure to reach a settlement with the plaintiffs. As a result, the Court of Appeals found that the trial judge could not have properly discharged his duty as thirteenth juror. We reverse. There is no indication that the trial judge was biased against the defendants; instead, it is clear that the trial judge believed that the ultimate outcome was obvious from the outset, and that the bad facts and poor testimony of one of the defendants should have prompted a substantial settlement offer from the defendants. The record indicates that the trial judge considered the issues in the case and explicitly approved the jury's apportionment of fault and the amount of damages awarded. Additionally, acting in our discretion under Tennessee Rule of Appellate Procedure 13(b), we address the other issues raised on appeal by the appellees, and find that they are without merit. As such, we reinstate the judgment of the trial judge approving the jury's verdict.

### Tenn. R. App. P. 11; Judgment of the Court of Appeals Reversed;
### Judgment of the Trial Court Reinstated

FRANK F. DROWOTA, III, C. J., delivered the opinion of the court, in which E. RILEY ANDERSON, ADOLPHO A. BIRCH, JR., JANICE M. HOLDER, and WILLIAM M. BARKER, JJ., joined.

Edward L. Martindale, Jr., Jackson, Tennessee, for the appellant, Robert Lewis Davidson.

Fred N. McLean, Paris, Tennessee, for the appellant, Charles R. Lindsey.

Raymond G. Prince, Nashville, Tennessee, for the appellants, Jason R. Ross and Alan P. Ross.

Russell E. Reviere and Michael L. Mansfield, Jackson, Tennessee, for appellees, Allen Briggs and Southland Transportation.

**OPINION**

**Factual Background**

On the afternoon of July 27, 1998, the plaintiff/appellee Robert Lewis Davidson ("Mr. Davidson") and his wife, Joyce Davidson ("Mrs. Davidson," or collectively "the Davidsons"), were traveling north in their pickup truck driven by Mr. Davidson on Highway 79 from McKenzie, Tennessee, to Paris, Tennessee, on a shopping trip.

Traveling southbound on Highway 79, in the following order, were the three other parties to this lawsuit: first, the defendant/appellant Charles Lindsey ("Mr. Lindsey"), driving his pickup truck; second, defendant/appellant Jason Ross ("Mr. Ross"), driving with four passengers in a Honda Civic; and third, defendant/appellee Allen Briggs ("Mr. Briggs"), driving his semi-tractor which was leased to his employer, defendant/appellee Southland Transportation ("Southland"), on his way to Jackson, Tennessee, to pick up a trailer.

Highway 79 consists of two lanes of traffic, one lane heading north, and one lane heading south. Near Routon, Tennessee, the southbound lane widens to two lanes for approximately one-half mile to allow southbound traffic to pass, while there remains only one northbound lane. When Mr. Lindsey, Mr. Ross, and Mr. Briggs arrived at this half-mile portion of highway, the following events occurred.

Mr. Ross was being tailgated by Mr. Briggs, so Mr. Ross moved into the right southbound lane. Mr. Briggs then moved into the area vacated by Mr. Ross and began to tailgate Mr. Lindsey. A disinterested witness, Mark Hart, testified at trial that Mr. Briggs was so close to Mr. Lindsey that a person could have stepped off Mr. Briggs's bumper onto Mr. Lindsey's bumper. Fearing that Mr. Briggs would "run over [him]," Mr. Lindsey then attempted to shift into the right lane. However, he collided with Mr. Ross, causing Mr. Lindsey to immediately pull back into the left lane, where he then collided with Mr. Briggs, who had already begun to pass. Mr. Briggs skidded across the center line of Highway 79 and collided with an oncoming northbound vehicle driven by Juan Calderon ("Mr. Calderon"), who is not a party to this action. Seeing these events unfold, Mr. Davidson had thought it best to pull off the highway and stop. After colliding with Mr. Calderon, however, Mr. Briggs continued to skid and collided head-on with the Davidsons' vehicle while it was parked on the shoulder of the highway. Mrs. Davidson was killed instantly, and Mr. Davidson sustained serious injuries.

On June 7, 1999, Mr. Davidson, individually and as administrator of the estate of Mrs. Davidson, and the Davidsons' five adult children (collectively, "the plaintiffs") filed a complaint in the Circuit Court of Henry County against Mr. Lindsey, Mr. Jason Ross, Alan Ross (the father of Jason Ross who was sued under the family purpose doctrine), Mr. Briggs, and Southland (all collectively, "the defendants"). The complaint alleged that the defendants proximately caused the

accident through negligent operation of their vehicles. Mr. Davidson claimed that he was entitled to damages for past and future medical expenses, impairment of earning capacity, lost wages, past and future pain and suffering, past and future emotional injuries, past and future loss of the enjoyment of life, property damages, injuries, and loss of consortium. As administrator of Mrs. Davidson's estate, Mr. Davidson claimed that the estate was entitled to damages for the pecuniary value of Mrs. Davidson's life, pain and suffering, medical and funeral expenses, prejudgment interest, and damages under the wrongful death statute. The Davidson children claimed they were entitled to damages for loss of consortium. The total amount of compensatory damages requested was $1,625,000.

Several motions were filed prior to trial. On February 9, 2000, the plaintiffs filed a motion to increase their request for compensatory damages to $5,000,000. On February 11, 2000, defendants Mr. Briggs and Southland filed a motion to dismiss the individual claims of the Davidson children, arguing that under Jordan v. Baptist Three Rivers Hospital, 984 S.W.2d 593 (Tenn. 1999), no separate cause of action exists for a child's loss of consortium. Further, the motion claimed that Jordan did not retroactively provide for spousal and parental consortium claims. Mr. Briggs and Southland also filed a motion in limine to exclude evidence concerning Mr. Briggs's and Mr. Ross's post-accident activities. Finally, on February 24, 2000, the plaintiffs filed a motion to amend the complaint to allege that Mr. Briggs was negligent per se in violating Tennessee Code Annotated section 55-10-103, the duty to give information and render aid.

The trial court heard all four motions on April 27, 2000. The plaintiffs' motions to amend their complaint were granted. The parties agreed to dismiss the children as plaintiffs. The trial court denied the motion in limine of Mr. Briggs and Southland. On July 24, 2000, the trial court granted one final motion submitted by the plaintiffs, to preclude reference to the fact that certain medical and funeral expenses incurred by the Davidsons had been paid by insurance and/or Medicare.

A jury trial was held on July 26 and 27, 2000. The jury found that Mr. Briggs and Southland were 100% liable, and the jury awarded damages of $1,250,000 to Mr. Davidson and $500,000 to the estate of Mrs. Davidson. The trial court entered judgment on the jury's verdict on August 14, 2000, and dismissed the plaintiffs' claims against the remaining defendants.

Mr. Briggs and Southland moved for a new trial on September 13, 2000. The trial court denied the motion on October 10, 2000. On November 1, 2000, Mr. Briggs and Southland filed a motion to set bond and to stay execution of the judgment pending appeal; the motion was denied by the trial court on November 9, 2000. On November 28, 2000, Mr. Briggs and Southland filed a motion for review of the trial court's denial of the motion to stay execution with the Court of Appeals. On December 18, 2000, the Court of Appeals reversed the trial court and allowed Mr. Briggs and Southland to file one million dollars bond to stay execution of the judgment pending appeal. Mr. Briggs and Southland filed the bond on January 12, 2001.

Mr. Briggs and Southland appealed to the Court of Appeals, presenting seven issues for review. The Court of Appeals reached only the first issue, whether the trial court properly

discharged its duty as thirteenth juror to independently weigh the evidence presented at trial and determine whether the evidence preponderated for or against the jury's verdict.

The Court of Appeals found that based on the trial judge's commentary during trial, at the hearing on the motion for new trial, and at the bond hearing, there was "an appearance of bias against Mr. Briggs and Southland Transportation due to the failure of settlement between their insurance carrier and the plaintiffs." Thus, the Court of Appeals determined that the trial judge could not have properly discharged his duty as thirteenth juror, and the Court of Appeals reversed and remanded for a new trial.

We granted Mr. Davidson, Mr. Lindsey, Mr. Ross, and Alan Ross's Rule 11 applications for permission to appeal, and we now reverse the decision of the Court of Appeals and reinstate the judgment of the trial court.

## Analysis

### I. Motion for New Trial

No verdict is valid until it is approved by the trial court judge. See Cumberland Tel. & Tel. Co. v. Smithwick, 79 S.W. 803, 805 (Tenn. 1904). Where, in a motion for new trial, the judge simply approves the jury's verdict without further comment, the appellate court presumes that the trial judge adequately performed his function as thirteenth juror. See Holden v. Rannick, 682 S.W.2d 903 (Tenn. 1984) (citing Central Truckaway Sys. v. Waltner, 253 S.W.2d 985, 991 (Tenn. Ct. App. 1952). This duty of a trial judge to act as "thirteenth juror" is well established:

> The reasons given for the rule are, in substance, that the circuit judge hears the testimony, just as the jury does, sees the witnesses, and observes their demeanor upon the witness stand; that, by his training and experience in the weighing of testimony, and the application of legal rules thereto, he is especially qualified for the correction of any errors into which the jury by inexperience may have fallen, whereby they have failed, in their verdict, to reach the justice and right of the case, under the testimony and the charge of the court; that, in our system, this is one of the functions the circuit judge possesses and should exercise--as it were, that of a thirteenth juror. So it is said that he must be satisfied, as well as the jury; that it is his duty to weigh the evidence; and, if he is dissatisfied with the verdict of the jury, he should set it aside.

Smithwick, 79 S.W. at 804.

When the judge comments as to the reasons for his or her decision, "this court looks to them only for the purpose of determining whether he passed upon the issues, and was satisfied or dissatisfied with the verdict thereon." Id. at 805.

The Court of Appeals determined that the trial judge in this case failed to properly discharge his duty as thirteenth juror because his bias against two of the defendants, Mr. Briggs and Southland, prevented him from independently weighing the evidence and objectively determining his satisfaction with the jury's verdict. In support of its decision, the Court of Appeals quoted at length the trial judge's comments during the trial itself, the hearing on the motion for a new trial, and the hearing on the motion to set bond and stay execution of the judgment:

At the close of the proof on the first day of trial, after the jury had exited the courtroom, the trial judge made the following comments to the parties' attorneys:

Trial Judge: Gentlemen, let me ask you, didn't I order this case into mediation somewhere earlier?

Mr. Martindale: Yes, sir.

Trial Judge: Who mediated it?

Mr. Martindale: Judge McGinley.

Trial Judge: Judge McGinley was the mediator?

Mr. Martindale: Yes, sir.

Trial Judge: The reason I pose that question to you is, you're all experienced attorneys. I mean, this is not your first time down the path. And from time to time you see cases, perhaps not that often, but you see cases that ought to be settled. And this, quite obviously, is one of those cases. I obviously have enough calluses to know that many times cases that should be settled, aren't settled.

And they are many times not settled for the wrong reasons.

I realize that there can be recalcitrant plaintiffs. And sometimes there's stubborn defendants. And I suspect from time to time there might even be a case where, perhaps, everybody didn't understand their positions, their weaknesses and their strengths.

I say that, and certainly wouldn't suggest that it's the attorneys.

But I think perhaps you really want to reevaluate your positions, and maybe take a few minutes to talk to each other and make sure that everybody has got their best offers up on top of the table here.

It would be very interesting to see what the jury will do with the case. But, you know, I see a whole lot of interesting cases and I suspect that you do, too. And

justice says that if it can be settled, then it ought to be settled. I'd like to make sure that everybody has done what they ought to have done here. And I'm not suggesting for one moment that you haven't. You know, sometimes there's slight inflection of a word that is misinterpreted. And people think, well, they've stopped there, and I ain't going to be the one to make the next overture. You need to make sure that you got all your money on the table. Particularly now that you've got all the facts before the jury.

At the October 10, 2000 hearing on the motion for a new trial, the trial judge stated the following with respect to the failure to settle the case and the mediation that had taken place: [1]

You were given a file that some insurance adjuster or appraiser either was unable or inexplicably refused to evaluate. I'm aware of that.

* * *

The facts were so bad that after this case was over, I sought out Judge McGinley, who I had had mediate this matter, to remonstrate with him as to why this case had not been settled. If there was ever a case begging for settlement, this was it. Incidentally, Judge McGinley is very good about settling these. He had no explanation, other than it was an adamant feeling on both behalf of the plaintiff and the defendant. It was his feeling that had he been able to coerce a reasonable offer, that the plaintiff would have been coerced to take a reasonable offer. Judge McGinley is pretty good at this. As I say, I went to him to remonstrate with him for not settling it. This case should have been settled.

* * *

I would suspect that a wise plaintiff might be talking about some settlement. The question is, can I get a wise defendant. He's been forewarned now. I know how you handle cases, Mr. Reviere. Perhaps you might ought to knock somebody around a little bit.

On November 9, 2000, the trial judge again discussed the issue of settlement during the hearing on the motion to stay execution of the judgment.

---

[1] Rule 31 of the Tennessee Rules of the Supreme Court ("Rule 31") governs judicial settlement conferences, which are mediations conducted by judicial officers. See Tenn. Sup. Ct. R. 31, § 2(e). As a Rule 31 "neutral," a judge acting as a mediator must "preserve and maintain the confidentiality of all information obtained" during Rule 31 proceedings. See Tenn. Sup. Ct. R. 31, §§ 2(*l*), 10(d). Defendants imply that this confidentiality was breached and point to the in-court exchange with the trial judge as additional evidence of bias on the part of the trial court. The record does not reflect the information, if any, imparted to the trial judge by the judge conducting the settlement conference. We decline to infer impropriety from this exchange.

Trial Judge: Let me ask you - it has bothered me in this case since it's [sic] inception, of why it didn't settle. Was this million dollars offered to the plaintiff?

Mr. Reviere: I guess we're waiting. I understood that the discussions and mediation are supposed to be kept in confidence. But I was . . .

Trial Judge: Well, I think I'd like to consider that, because I strongly detect an insurance company that has gone beyond the realm of recalcitrance. Knowing the facts, or they should have known the facts in this case, they should have been up there, cramming the million dollars down these plaintiffs' throats. Now, the plaintiff can pound their chest all they want to and say, "Well, we ain't going to accept that or we wouldn't accept it," but he would have been an utter fool if he didn't, and he would have perhaps been sued for malpractice somewhere along the line. But I detect an unwillingness to deal. I detect an unwillingness to get this case to its ultimate conclusion, to hold it off, to not settle the case.

* * *

I don't see that, now that we've got judgment here - what did they offer the man? Did they ever offer anything near the million?

Mr. Reviere: Well, I'm answering this because Your Honor has put the question to me, and as an officer of the court I am responding. I guess I have to say at the outset, it was my understanding that this is not, this was supposed to be, under the rules, kept in confidence. But I will answer your question.

Trial Judge: Well, it's kept from the court prior to trial. And what I'm attempting to do is to evaluate and see if there was a good-faith attempt to settle, or as I strongly have suspected all along, there was not.

* * *

I remember remonstrating with you gentlemen after the jury came back with - no, I guess it was on the Motion for New Trial, and suggesting that now that the adrenaline had subsided and the emotions had eased, that you look to settling this case. I assume that settlement negotiations were to no avail, or I wouldn't have you in here today. Were there any?

Following the hearing on the motion to stay execution of the judgment, the trial judge denied the motion and stated his reasoning as follows:

I'm of the opinion, and remain of the opinion, that this insurance company has not negotiated in good faith, that they were attempting to delay this case and they are attempting at this time to obtain the benefits of the very situation that they created,

that is essentially, a free appeal, having a case that should have been settled and could have been settled.

In reversing the jury's verdict, the Court of Appeals failed to quote language from the hearing on the motion for new trial in which the trial judge clearly acknowledged his approval of the verdict:

> Excessiveness. I rest very easy with the amount of the verdicts that were returned in this case. There is no question, whatsoever, as to the appropriateness of the larger of the two. That is, the surviving husband. There is that question that will have to be resolved by the Supreme Court as to the deceased wife's verdict because of the inclusion of the loss of consortium elements.

> Apportionment. I approve the verdict of the jury as to that. . . ..

> I rest easy with what I did with the case. I approve the verdicts of the jury in this instance.

The trial judge's one reservation regarding the verdict involved the award to the estate of Mrs. Davidson regarding the application of Jordan v. Baptist Three Rivers Hospital, 984 S.W.2d 593 (Tenn. 1999), but that issue was made moot by Hill v. City of Germantown, 31 S.W.3d 234 (Tenn. 2000). It is apparent that the trial judge had no reservations about the finding of negligence or the amount of the award.

Mr. Briggs and Southland assert that the judge's statements approving the verdict do not cure the bias present throughout the trial. They state that nothing "forecloses an appellate court from examining the judge's comments during a hearing on a motion for new trial to determine whether the court was biased for or against a party. . .." However, it appears that rather than exhibiting a bias against Mr. Briggs and Southland, the judge's fervor is instead related to his belief that the facts and circumstances presented a very bad case for Mr. Briggs and Southland. Indeed, given the bad facts and poor testimony of Mr. Briggs, the trial judge could not understand why Mr. Briggs and Southland would not settle the case. At the hearing for the motion for new trial, counsel for Mr. Briggs himself stated the following:

> MR. REVIERE: . . .So we suggest to Your Honor that it was all calculated to simply put Mr. Briggs in as bad a light as could be. And as we all know, Mr. Briggs didn't need any help in that regard.

> THE COURT: He didn't need a whole lot of help.

Later in the hearing, the trial judge goes on to say the following:

> You were given a case that had an impossibly bad set of facts and a client who did everything, notwithstanding your best advice and preparation, the wrong way. I

don't think I've ever seen a client that really related his series of events worse than this man did. If there were two ways to testify, one acceptable and the other unacceptable, he found a third way to make it sound worse.

These statements explain why, after the first day of trial (which included the testimony of Mr. Briggs), the trial judge suggested to the parties, outside the presence of the jury, that they again try to settle the case.

The judge's comments do not reveal a bias against the defendants: his comments indicate that he wholeheartedly agreed with the jury verdict as the thirteenth juror, and that in his opinion, the ultimate outcome was obvious from the outset and should have prompted a substantial settlement offer from Mr. Briggs and Southland. The trial judge explicitly approved the jury's apportionment of fault and the amount of damages awarded. There is nothing in the record to indicate that the trial judge failed to adequately perform his duty as thirteenth juror. Instead, the record reflects that he logically considered the issues and indicated his satisfaction with the verdict. Thus, we reverse the Court of Appeals on this issue and reinstate the judgment of the trial judge approving the jury's verdict.

To prevent needless litigation and to promote judicial economy, we exercise our discretion and address the other issues raised by Mr. Briggs and Southland rather than remanding the case to the Court of Appeals. See Tenn. R. App. P. 13(b) ("[t]he appellate court . . . may in its discretion consider other issues in order, among other reasons: (1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process.").

## II. Cross-Examination of Mr. Briggs

The appellees argue that testimony regarding whether or not Mr. Briggs rendered assistance to the Davidsons following the accident was irrelevant and that it was admitted inappropriately as a prior bad act. The challenged testimony relating to Mr. Briggs's conduct at the scene of the accident clearly is not barred by Tennessee Rule of Evidence 608(b). Mr. Briggs's testimony was impeached only after he claimed, in response to an open-ended question, that he had assisted the Davidsons. He was then impeached by his inconsistent deposition testimony. This was proper impeachment, and, in sum, the trial court's admission of this testimony was not error. Thus, we find that this issue is without merit.

## III. Testimony of Mr. Ross

Mr. Briggs and Southland argue that the trial court erred by allowing Mr. Ross to testify with regard to (1) facts concerning the activities of Mr. Ross and the occupants of his vehicle to free the Davidsons from their truck beyond the facts necessary to describe the accident scene and, to some extent, (2) the nature of Mr. Davidson's injuries immediately following the accident. Mr. Ross testified that he and one of his passengers pulled Mr. Davidson out of his truck, and he described what they saw and what Mr. Briggs did. Testimony describing the scene was relevant and properly admitted. This issue is without merit.

## IV.  Testimony of Trooper Sexton

Mr. Briggs and Southland argue that Trooper Sexton's testimony included inadmissible hearsay that affected the jury's verdict.  The appellees claim specifically that Mr. Ross's statement to Trooper Sexton that Mr. Briggs had been tailgating him prior to the accident was hearsay. Plaintiffs assert that Mr. Ross's statement qualifies as an excited utterance: the defendants conceded in their brief to the Court of Appeals that the accident qualifies as a startling event, so the only question is whether Mr. Ross's statement was the spontaneous result of stress occasioned by this event. Mr. Ross was nineteen years old at the time of the accident, and just before talking to Trooper Sexton, he had participated in pulling Mr. and Mrs. Davidson from their truck just before it exploded.  Mr. Ross was so much under the stress occasioned by the accident that he did not remember talking to Trooper Sexton.  Thus, we find that Mr. Ross's statement falls within the excited utterance hearsay exception.

We further note that Trooper Sexton's testimony was cumulative to that of several other witnesses, including Mr. Ross on direct examination, Mr. Lindsey, and Mark Hart, a disinterested witness to the accident, all of whom testified that Mr. Briggs was tailgating the other cars.

Thus, this issue is likewise without merit.

## V.  Apportionment of Fault

The appellees claim that the jury's apportionment of 100% fault against Mr. Briggs and Southland is clearly erroneous and not supported by material evidence.  Upon careful review of the record, we conclude that the jury's apportionment of 100% fault to Mr. Briggs and Southland is not clearly erroneous and is supported by material evidence. See Tenn. R. App. P. 13(d);  Cross v. City of Memphis, 20 S.W.3d 642, 644-45 (Tenn. 2000). Thus, this issue is without merit.

## VI.  Jury Instructions

Mr. Briggs and Southland next assert that the trial court erred by failing to instruct the jury that they should consider the ages of the Davidsons' children in determining whether the children were entitled to loss of consortium damages as a result of Mrs. Davidson's death.  Mr. Briggs and Southland base this argument on the following language from Jordan:

> Adult children may be too attenuated from their parents in some cases to proffer sufficient evidence of consortium losses.  Similarly, if the deceased did not have a close relationship with any of the statutory beneficiaries, the statutory beneficiaries will not likely sustain compensable consortium losses or their consortium losses will be nominal.  The age of the child does not, in and of itself, preclude consideration of parental consortium damages.

984 S.W.2d at 601. Thus, the appellees assert that the trial judge erred by not instructing the jury that the age of the deceased's children should be considered in calculating damages for the children's loss of consortium.

While the Jordan decision makes clear that the age of a child does not in and of itself preclude recovery of consortium losses, it does not mandate a jury instruction on this issue. At trial, each of the five Davidson children testified about the close relationship they had with their mother, including one child who, though an adult, was living at home at the time of the accident. Thus, the evidence indicated that close relationships existed between each of the Davidson children and their mother. The jury was entitled to consider this evidence of loss of consortium in calculating the pecuniary value of Mrs. Davidson's life. The lack of a specific jury instruction was not error in this case.

## VII. Damages

Mr. Briggs and Southland next claim that the damages awarded by the jury were excessive. If there is any material evidence to support the award of damages, we must affirm the judgment. Tenn. R. App. P. 13(d). The $500,000 damage award to Mrs. Davidson's estate is supported by material evidence. Approximately $101,000 of the $500,000 verdict is conceded.[2] The remaining portion of the award, approximately $399,000, is supported by material evidence related to Mrs. Davidson's pecuniary contributions to her family in the form of personal services, such as cooking and other housekeeping and the value of her consortium. Her five children testified at length about the strength of their relationship with their mother and her role in keeping the family together. In sum, material evidence supports the damages awarded to the estate.

Likewise, the jury's award of $1,250,000 in damages to Mr. Davidson is supported by material evidence. Mr. Davidson sustained extensive injuries that greatly affected his life. His medical bills alone totaled $200,000. His major injury was an open fracture of his left femur, and it required two surgical procedures involving the insertion of 12" metal rods in his leg. He spent a month convalescing at his daughter's home, during which time he was bedridden and required nursing care. He received painful physical therapy sessions four times per week; Mr. Davidson's daughter, Dianne Cook, testified at trial as to the grueling nature of the therapy:

Q. And what type of physical therapy were they doing for him?

A. They would come out and – he had a brace that he had to wear at all times, because he had to keep his leg straight. And they would remove that brace, and they would start bending his leg. And she would actually get down on her hands and knees and she would start – because his leg wouldn't bend at all. And she would get down on her hands and knees and she'd start pushing his leg. And I would put my weight on his shoulders to hold him in the wheelchair.

---

[2] The amount conceded is as follows: $868.25 (medical expenses) + 7,889.90 (funeral expenses) + 92,568 (social security for 19 years life expectancy) = $101,326.15.

Q. Was that a painful experience for him?

A. Yes. He would scream.

Q. You okay?

A. (Witness moves head up and down.)

Mr. Davidson endured this physical therapy for two months before doctors would allow him to begin using a walker. He then continued physical therapy five days per week, for two hours each session. Finally, two years after the accident, Mr. Davidson was released from his doctor's care and assigned a permanent impairment rating of 54%, based on loss of motion in his left knee and ankle, the shortening of his leg, atrophy of his thigh, and decreased venous supply to his leg which results in leg swelling. Due to the swelling, Mr. Davidson is permanently required to wear a "Jobst stocking" to reduce excess fluid in his leg. Mr. Davidson's son and daughter-in-law moved into his home to help care for him and assist with daily tasks, as Mr. Davidson is unable to live alone. Mr. Davidson's mobility is severely limited; he cannot go up stairs without the aid of a banister or like structure, and he cannot stand without balancing assistance. He uses either a walker or two canes to walk at all times. He can no longer engage in activities he enjoyed before the accident, such as woodworking, because he cannot steady himself. Furthermore, Mr. Davidson wore a prosthetic right leg prior to the accident, and had adjusted quite well to using it. The prosthesis was damaged in the accident and had to be repaired and subsequently shortened to make it level with his injured left leg. Mr. Davidson, his daughter, his son, and his doctor testified about Mr. Davidson's injuries and their effect on him, and their testimony went unchallenged. Thus, the damages awarded are supported by material evidence. The defendant's claim that the damages were excessive is without merit.

## Conclusion

Having concluded that the trial judge fulfilled his duty to act as thirteenth juror, the judgment of the Court of Appeal is reversed. Additionally, the six other issues presented for review are without merit. As such, the judgment of the trial court is reinstated. The costs of the appeal are taxed to the appellees, Allen Briggs and Southland Transportation, for which execution may issue if necessary.

_____
FRANK F. DROWOTA, III, CHIEF JUSTICE