IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 3, 2019 Session

## STAINMASTER CARPET & RESTORATION, LLC ET AL. v. MUSIC CITY MESSENGER SERVICE, INC. ET AL.

**Appeal from the Chancery Court for Davidson County**
No. 15-289-II          William E. Young, Chancellor

_____

### No. M2018-01368-COA-R3-CV

_____

This appeal arises from an action for declaratory judgment as to the ownership of a business, defamation, and tortious interference with business relations. The plaintiff carpet cleaner alleged that the defendant entrepreneur and his wife loaned money to the plaintiff to expand his carpet cleaning business with the condition that the defendants handle the business's finances and bookkeeping. The defendants asserted that they started a new carpet cleaning business and the plaintiff was merely an employee. Following a jury verdict for the plaintiff, the trial court denied the defendants' motion for a new trial and remittitur. On appeal, the defendants contend that the trial judge failed to fulfill his duty as the thirteenth juror and there was no material evidence to support the jury's verdict or award of damages. After reviewing the record, we find the trial judge fulfilled his role as the thirteenth juror and that there was material evidence to support the jury's verdict and award of damages. Accordingly, we affirm the judgment against the defendants.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Thomas F. Bloom, Nashville, Tennessee, for the appellants, Scott M. Fulner, Pamela Fulner, Music City Messenger Service, Inc., and PIP of Tennessee, Inc.

W. Carl Spining and William Horace Neal, III, Nashville, Tennessee, for the appellees, Stainmaster Carpet & Restoration, LLC, and James Brandon Walker.

Randall E. Schisler, appellee, pro se.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

The central issue of this case is a dispute over the terms of an oral agreement made in 2013 by entrepreneurs Brandon Walker and Scott Fulner. Mr. Walker had owned and operated a carpet cleaning business since 2004, and Scott Fulner had owned a variety of businesses since the 1980s. In 1993, Mr. Fulner incorporated Music City Messenger Service, Inc. ("MCM") as a "shell" corporation under which he operated a delivery company and a mortgage company. Mr. Fulner later sold the delivery business and closed the mortgage company, but MCM remained in existence to collect residual payments from a real estate sale. Mr. Fulner and Mr. Walker met in 2009 at a social event, and Mr. Fulner eventually hired Mr. Walker to clean the carpets at Mr. Fulner's home and at the offices of another one of Mr. Fulner's businesses, PIP of Tennessee, Inc., d/b/a Dynamark Graphics Group ("Dynamark").[1]

In late 2012 or early 2013, Mr. Walker and Mr. Fulner entered into an oral agreement, the terms of which the parties later disputed. The agreement was never reduced to writing, and Mr. Walker and Mr. Fulner were the only persons present at its formation. According to Mr. Walker, he had recently begun operating his carpet cleaning business under the name Stainmaster when Mr. Fulner proposed loaning Mr. Walker money for Mr. Walker to purchase a new van and additional equipment. To ensure repayment of the loan, Mr. Fulner insisted that Stainmaster's finances and bookkeeping be handled by MCM and the loan repayments be automatically deducted from Stainmaster's revenue. As part of the deal, Stainmaster and Dynamark would exchange services, with Dynamark receiving free carpet cleaning and Stainmaster receiving free printing services. When the loans were repaid, Mr. Walker was to retake control of the funds held by Mr. Fulner.

According to Mr. Fulner, Mr. Walker approached Mr. Fulner because Mr. Walker's carpet cleaning business was failing due to, *inter alia*, a lack of proper equipment. Although Mr. Fulner was not interested in investing in the existing business or becoming partners in a new venture, he saw an opportunity to leverage his business experience and MCM's existing administrative capabilities to build a new carpet cleaning company. Mr. Fulner's goal was to grow the business and then sell it. Accordingly, Mr. Fulner offered to start the business and hire Mr. Walker as the operations manager. If

---

[1] Mr. Fulner was president and 30% owner of Dynamark. The remaining stock was held by two family trusts, neither of which are a party to this case.

the business grew, the two men would either split the profit from its sale, or Mr. Fulner would sell the business to Mr. Walker for half of the asking price. Mr. Fulner would use the existing administrative staff of MCM to handle Stainmaster's administrative needs.

What is undisputed is that the two men reached an agreement of one kind or another and, in March 2013, Mr. Fulner opened a bank account under the name Music City Messengers, d/b/a Stainmaster Cleaning & Restoration ("the Stainmaster Account"). The account was opened with a check for $10,000 from MCM's primary account. It is also undisputed that the $10,000 was structured as a loan from MCM, to be repaid in 12 equal payments at 8% interest. Shortly thereafter, a 1998 Ford van was purchased, which Mr. Walker used to perform carpet cleaning services under the Stainmaster name. Stainmaster's clients sent payment to the Dynamark office, where it was accounted for by two MCM employees before being deposited into the Stainmaster Account. The van was insured on a policy in the name of Mr. Fulner, d/b/a Stainmaster. Mr. Fulner also opened a business credit card account under his name and the name of Stainmaster. In May 2013, a 2005 Chevrolet van was purchased for $16,000 and titled in the name of Music City Messengers, d/b/a Stainmaster. The van was paid for with a loan from Mr. Fulner's wife, Pamela Fulner, to be repaid in 24 equal installments at 8% interest. All of Stainmaster's credit card bills, loan payments, payroll, and operating expenses were paid out of the Stainmaster Account.

It is also undisputed that Mr. Walker's role was largely confined to managing the day-to-day cleaning services, and Mr. Fulner's role—through MCM—was largely confined to managing the administrative functions of the business. Mr. Walker hired and trained employees, directed the solicitation of new clients, coordinated services for existing clients, and performed the carpet cleaning. The employees began and ended their day at Mr. Walker's house, where the vans were kept. Although Mr. Walker and the other employees were paid through a payroll service as employees of MCM, Mr. Walker picked up payroll from the Dynamark office and delivered them to Stainmaster's employees.

In or around March 2014, Mr. Walker was involved in an automobile accident while driving the 1998 Ford van. The insurance company declared the vehicle a total loss and issued a check to Mr. Fulner, d/b/a Stainmaster, for $9,311.49. The proceeds were deposited into the Stainmaster Account, and shortly thereafter a 2003 Ford van was purchased and titled to Stainmaster Carpet Cleaning. Mr. Walker signed the invoice and vehicle registration for the 2003 Ford van as "owner."

In June 2014, Mr. Walker hired Randy Schisler as a cleaning technician. Although Mr. Schisler proved less than satisfactory in his role, Mr. Walker saw that Mr. Schisler "had a gift of gab" and thought Mr. Schisler would be good at sales. Thus, Mr. Walker moved Mr. Schisler to a sales position. The next month, Stainmaster had a booth at the

2014 Greater Nashville Apartment Association trade show, where Stainmaster networked with apartment complex managers from the Nashville area. Adding Mr. Schisler and attending the trade show led to an increase in clients. Consequently, a 2002 GMC van was purchased with a second loan from Ms. Fulner and titled to Stainmaster Carpet Cleaning. Like the first, the second loan was to be repaid in 24 equal installments with eight percent interest.

Until this point, Mr. Walker and Mr. Fulner maintained an amicable relationship. In late 2014, however, Mr. Fulner and Mr. Walker's disparate views of their respective roles in Stainmaster became apparent when they disagreed about whether the Stainmaster vans should be kept at Mr. Walker's house or at Dynamark's office. The growing tension rose to a crescendo in early February 2015.

On Friday, February 6, 2015, one of Stainmaster's vans was ready to be picked up from a repair shop. Both Mr. Walker and Mr. Fulner showed up, and both claimed ownership of the van. After an argument in the parking lot, it was clear to Mr. Walker and Mr. Fulner that their arrangement was no longer working. They agreed to meet that Sunday morning at the Dynamark offices to discuss the dissolution of their business relationship. At their meeting, Mr. Fulner offered to part ways in exchange for a payment of $36,000. As with their initial agreement, Mr. Walker and Mr. Fulner later disputed the terms of Mr. Fulner's offer. According to Mr. Walker, Mr. Fulner asked for $36,000 to pay off the remaining loan balances and to pay for MCM's administrative services. According to Mr. Fulner, he offered to sell the business to Mr. Walker for $36,000. Either way, the parties agree that their negotiations quickly broke down and Mr. Fulner "fired" Mr. Walker the next day via text message and demanded the return of the van and equipment in Mr. Walker's possession.

Mr. Walker did not capitulate to Mr. Fulner's demands. Instead, he sent a letter to all of Stainmaster's customers, informing them that future payments should be sent to Mr. Walker's home address instead of Dynamark. Mr. Walker also changed the addresses on the Stainmaster vans to his home address and continued to perform carpet cleaning services under the Stainmaster name. At the same time, Mr. Fulner continued running Stainmaster with Mr. Schisler. Emails were sent to Stainmaster's clients, informing them that Mr. Walker had gone "rogue" and was no longer an authorized representative of Stainmaster. Because of the dueling Stainmasters, several clients refused to tender payment to either party until the dispute was resolved.

On March 9, 2015, Mr. Walker and Stainmaster Carpet & Restoration, LLC[2] (collectively, "Plaintiffs") filed the present action against Mr. Fulner, Ms. Fulner, MCM, Dynamark (collectively, "Defendants"), and Mr. Schisler.[3] The complaint asked for a declaratory judgment that the Stainmaster business belonged to Mr. Walker and requested damages for defamation and tortious interference with business relations. Defendants filed an answer, generally denying the allegations and asserting counterclaims for conversion, defamation, tortious interference with business relations, and fraud.

The case proceeded to a five-day jury trial on January 22, 2018. The jury found that Mr. Walker was the rightful owner of the Stainmaster business, including its vehicles, equipment, supplies, and accounts, and awarded Mr. Walker $100,000 against Mr. Fulner.[4] In addition, the jury found that Mr. Fulner communicated defamatory statements about Mr. Walker, damaging his business and reputation and causing a loss of clients of Stainmaster, and awarded $75,000 against Mr. Fulner on this claim. Finally, the jury found that Mr. Fulner wrongfully interfered with Mr. Walker's business relationships, causing a loss of clients and damages to Stainmaster during the period at issue, and awarded an additional $75,000 on this issue.[5] On April 13, 2018, the trial court entered judgment for Plaintiffs.

On April 20, 2018, Defendants filed a Motion for Judgment Notwithstanding the Verdict, for a New Trial, and for Remittitur of Damages. Defendants asserted that "the jury verdict was against the weight of the evidence" and that the combined award of $160,000 in damages for defamation and tortious interference with business relations was excessive because the amounts bore no reasonable relation to the damages allegedly suffered. In response, Plaintiffs asserted that the relevant question was whether "a reasonable mind could reach but one conclusion" and argued that the verdict resulted from the jury's consideration of competing evidence and the credibility of the parties.

---

[2] Mr. Walker filed articles of organization for Stainmaster Carpet & Restoration in August 2014. According to the verified complaint, Mr. Walker decided to form the LLC when he felt like Mr. Fulner was becoming too involved in the business.

[3] Mr. Schisler filed an answer but did not participate in the trial or in this appeal. The trial court found he was not liable for the judgment.

[4] The jury verdict form did not specify which Defendant was responsible for the $100,000 award; however, the trial court later revised the verdict to reflect that the award was against only Mr. Fulner.

[5] The jury also awarded $10,000 against Dynamark for defamation and tortious interference with business relations, which was later remitted by the trial court.

Plaintiffs also contended that the amount of damages was supported by testimony about lost profits and emotional damage and by Mr. Walker's personal tax returns and client invoices.

On June 27, 2018, the trial court denied Defendants' motion, finding the evidence preponderated in favor of the jury's findings:

> The central issue in this case was which party, Plaintiff Walker or Defendant Scott Fulner . . . owned the Stainmaster business. The evidence was undisputed that this business was started by Plaintiff Walker and at some point Plaintiff Walker solicited Defendant Scott Fulner's assistance in running this business. It was also undisputed that no written agreement was ever entered between these two parties defining the role each would play in running the business.

> Thus, the jury was left to evaluate the credibility of the testimony of the witnesses and the documents presented to determine the ownership interests of the various parties. Several outcomes were possible given the lack of a definitive agreement. The jury could have found (1) the business was owned by Defendant Scott Fulner or one of the corporate Defendants, with Plaintiff Walker as an employee of the business, (2) the business continued to be owned by Plaintiff Walker, with Defendant Scott Fulner or one or both of the corporate Defendants retained to provide financial and accounting services to the business, or (3) the business was owned by both Defendant Scott Fulner (or one of the corporate Defendants) and Plaintiff Walker as partners in an oral partnership with each making contributions to the partnership.

> The jury ultimately determined that [Mr.] Walker remained the owner of the business, and never transferred it to any of the Defendants, including [Mr.] Fulner. The evidence preponderates in favor of this verdict. The lack of an agreement between the parties, particularly given the relative sophistication of Defendant Scott Fulner and Plaintiff Walker's lack of such sophistication, could lead the jury to conclude that Plaintiff Walker never transferred the business. The lack of any defined consideration being received by Plaintiff Walker as a result of the alleged transfer of his ongoing business also militates against a finding that any transfer actually occurred. Finally, as both Plaintiff Walker and Defendant Scott Fulner testified, the goal of this arrangement was ultimately that both parties would share the profits generated from this venture, which mitigates against a finding that Plaintiff Walker actually sold the business to any of the Defendants.

The trial court also found evidence to support the jury's award of damages, reasoning that Mr. Fulner's actions caused emotional anguish and a loss of profit:

> [T]he actions of Defendant Scott Fulner in terminating Plaintiff Walker's relationship with the business and then seeking to run the business on his own caused Plaintiff Walker damages—the loss of his interest in the business as well as mental and emotional anguish. The record reflects Defendant Scott Fulner advised existing and potential customers that Plaintiff Walker no longer had any interest in the business, did not represent the business, and could no longer perform the work on its behalf, thus preventing Plaintiff Walker from continuing to profit from the business he originally started and causing him emotional damage. The record further reflects that these actions by Defendant Fulner resulted in a diminution of the business's customer base. Thus, the record adequately supports the jury's verdict awarding Plaintiff Walker $100,000 in damages against Defendant Scott Fulner for the loss of the business, as well as the jury's verdict awarding Plaintiff Walker $75,000 against Defendant Scott Fulner for defamation and $75,000 against Defendant Scott Fulner for tortious interference with a business relationship.

This appeal followed.

Defendants raise three issues that we restate as follows: (1) whether the trial court performed its duty as the thirteenth juror to independently weigh the evidence; (2) whether the court erred in finding there was material evidence to support the verdict; and (3) whether the trial court abused its discretion in failing to grant a remittitur of damages.

## STANDARD OF REVIEW

"Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Tenn. R. App. P. 13(d). "Material evidence is 'evidence material to the question in controversy, which must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case.'" *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 422 (Tenn. 2013) (quoting *Knoxville Traction Co. v. Brown*, 89 S.W. 319, 321 (Tenn. 1905)). When determining whether there is material evidence to support a jury verdict, we must "take the strongest legitimate view of all the evidence in favor of the verdict, assume the truth of all evidence that supports the verdict, allow all reasonable inferences to sustain the verdict, and discard all countervailing evidence." *Barkes v. River Park Hosp., Inc.*, 328 S.W.3d 829, 833 (Tenn. 2010) (quoting *Whaley v. Perkins*, 197 S.W.3d 665, 671 (Tenn. 2006)).

In Tennessee, "[n]o verdict is valid unless approved by the trial judge acting as the thirteenth juror." *Meals ex rel. Meals*, 417 S.W.3d at 420. As the thirteenth juror, "the trial judge is under a duty to independently weigh the evidence and determine whether the evidence preponderates in favor of or against the verdict." *Shivers v. Ramsey*, 937 S.W.2d 945, 947 (Tenn. Ct. App. 1996) (citing *McLaughlin v. Broyles*, 255 S.W.2d 1020 (Tenn. Ct. App. 1952); *Tiffany v. Shipley*, 161 S.W.2d 373 (Tenn. Ct. App. 1941)). When the trial judge approves the verdict without comment, we "presume that he has adequately performed his function as a thirteenth juror." *Holden v. Rannick*, 682 S.W.2d 903, 905 (Tenn. 1984). "When the judge comments as to the reasons for his or her decision, 'this court looks to them only for the purpose of determining whether he passed upon the issues, and was satisfied or dissatisfied with the verdict thereon.'" *Davidson v. Lindsey*, 104 S.W.3d 483, 488 (Tenn. 2003) (quoting *Cumberland Tel. & Tel. Co. v. Smithwick*, 79 S.W. 803, 805 (Tenn. 1904)).

When a trial court approves a jury verdict as the thirteenth juror, this court maintains the authority to suggest or require a remittitur on appeal. *Meals ex rel. Meals*, 417 S.W.3d at 422. However, in such cases, our review of the verdict and our ability to suggest a remittitur is "limited to a review of the record to determine whether the verdict is supported by material evidence." *Id.*

## ANALYSIS

### I. THE THIRTEENTH JUROR RULE

Defendants argue that the trial judge improperly relied on a material-evidence standard and made findings that showed he doubted Mr. Walker's credibility. The comments cited by Defendants appear in the trial court's June 27, 2018 Order denying Defendants' Motion for Judgment Notwithstanding the Verdict, for a New Trial, and for Remittitur of Damages. Because the trial judge commented on his reasons for approving the verdict, we will look to those comments to determine only whether he misconceived or did not follow his duty to independently weigh the evidence and determine whether it preponderated in favor or against the jury's verdict. *See Dickey v. McCord*, 63 S.W.3d 714, 719 (Tenn. Ct. App. 2001) ("This Court may reverse the lower court's judgment and order a new trial only when the record contains statements that the trial court was dissatisfied with or disapproved of the jury's verdict or when the trial court absolved itself of or misconstrued its function as the thirteenth juror").

Defendants contend that the trial judge applied a material-evidence standard instead of the preponderance of the evidence standard because the trial judge cited to only a modicum of evidence to support his approval. We respectfully disagree that this shows the trial judge misunderstood or failed to perform his role as the thirteenth juror. It is well established that a trial judge need not cite to any evidence to support its approval of the verdict. *See Holden*, 682 S.W.2d at 905 ("Where a trial judge has simply approved the

- 8 -

verdict without comment, an appellate court will presume that he has adequately performed his function as a thirteenth juror."). Here, the trial judge clearly recognized his role as thirteenth juror, stating that his duty was to "independently weigh and review the evidence presented at trial to determine whether it preponderates in favor of the verdict." The trial judge then expressly stated that he found the evidence "preponderat[ed] in favor of the jury's findings that the Stainmaster business was owned by [Mr.] Walker" and preponderated in favor of the jury's award of damages. That the trial judge continued to explain his reasoning did not give rise to a duty to cite every piece of supporting evidence. This court looks to a trial judge's reasoning "only for the purpose of determining whether he passed upon the issues, and was satisfied or dissatisfied with the verdict thereon." *Davidson*, 104 S.W.3d at 488 (quoting *Cumberland Tel. & Tel. Co.*, 79 S.W. at 805).

Defendants also contend that the trial judge's reasoning indicates he deferred to the jury's credibility determinations. Defendants point out that the trial judge found Mr. Walker "solicited [Mr.] Fulner's assistance" despite Mr. Walker's testimony that Mr. Fulner initiated the business relationship. Defendants also point out that the trial judge found Mr. Fulner's role was to help run the business despite Mr. Walker's testimony that Mr. Fulner was merely a lender. Finally, Defendants point out that the trial judge found the issue of who started the Stainmaster business was undisputed despite conflicting testimony. We find it unnecessary to parse the semantics of the judge's reasoning; "[t]he accuracy of the trial court's determination as thirteenth juror is not a proper subject of appellate review." *Ladd by Ladd v. Honda Motor Co.*, 939 S.W.2d 83, 104 (Tenn. Ct. App. 1996) (citing *State v. Moats*, 906 S.W.2d 431, 435 (Tenn. 1995)). Even if we construed the trial court's statements as revealing doubt about the accuracy of Mr. Walker's testimony, we would not find the statements to be irreconcilable with its ultimate finding that the evidence preponderated in favor of the verdict. *See Mitchell v. Sherrill*, No. 01A01-9404-CV-00153, 1995 WL 413425, at *2 (Tenn. Ct. App. July 14, 1995) (affirming the trial judge's approval of a jury verdict despite his statements that he had some "misgivings").

Based on the foregoing, we find the trial judge properly performed his function as the thirteenth juror and approved the verdict.

## II.   MATERIAL EVIDENCE

Defendants also contend there was no material evidence to support the jury's finding that Mr. Walker was the owner of the Stainmaster business.[6] Under the material-evidence standard of review, we simply search the record "to ascertain if material evidence is present to support the verdict." *Meals ex rel. Meals*, 417 S.W.3d at 423 (quoting *Hohenberg Bros. Co. v. Missouri Pac. R. Co.*, 586 S.W.2d 117, 119 (Tenn. Ct. App. 1979)). In doing so, we are "required to take 'the strongest legitimate view of all the evidence in favor of the verdict, assume the truth of all evidence that supports the verdict, allowing all reasonable inferences to sustain the verdict, and to discard all countervailing evidence.'" *Id.* at 422 (quoting *Akers v. Prime Succession of Tennessee, Inc.*, 387 S.W.3d 495, 501 (Tenn. 2012)). "Material evidence is 'evidence material to the question in controversy, which must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case.'" *Id.* (quoting *Knoxville Traction Co.*, 89 S.W. at 321). Material facts may be proven "by direct or circumstantial evidence or a combination of both." *State v. Phillips*, 138 S.W.3d 224, 230 (Tenn. Ct. App. 2003) (citations omitted). Testimony alone may be sufficient to establish a material fact. *See Strickland v. City of Lawrenceburg*, 611 S.W.2d 832, 835 (Tenn. Ct. App. 1980) (finding testimony was material evidence to support the jury's verdict); *Henley v. Amacher*, No. M1999-02799-COA-R3-CV, 2002 WL 100402, at \*13 (Tenn. Ct. App. Jan. 28, 2002) ("[T]he surgeon's testimony provides the material evidence needed to sustain the jury's determination that the June 28, 1995 wreck left Mr. Henley permanently impaired.").

Mr. Walker and Mr. Fulner disputed ownership of the rights to use the Stainmaster trade name, to the revenues from services performed thereunder, and to possession of the assets used to perform those services. *See State ex rel. Elvis Presley Int'l Mem'l Found. v. Crowell*, 733 S.W.2d 89, 96 (Tenn. Ct. App. 1987) (describing the right to tangible and intangible property as a "bundle of rights"). Thus, the question is whether the record contains material evidence to support the jury's finding that Mr. Walker owned these rights.

Evidence of ownership "generally involves evidence with regard to possession and exercise of one or more of the prerogatives in the bundle of ownership rights." *Cunningham v. Dep't of Safety*, No. 01A01-9509-CH-00411, 1997 WL 266851, at \*2 (Tenn. Ct. App. May 21, 1997). The bundle of ownership rights includes: "(1) the right of

---

[6] Defendants did not appeal the jury's verdict on Plaintiffs' claims for defamation and tortious interference with business relationships.

possession, enjoyment and use; (2) the unrestricted right of disposition; and (3) the power of testimonial disposition." *State ex rel. Elvis Presley Int'l Mem'l Found.*, 733 S.W.2d at 96–97. "Generally speaking, 'a rebuttable presumption of ownership arises from possession of property," *Induction Techs., Inc. v. Justus*, 295 S.W.3d 264, 266 (Tenn. Ct. App. 2008) (quoting 73 C.J.S. Property § 70); however, this presumption may be refuted by evidence that produces "belief in the minds of the jury that the title was in another." *Park v. Harrison*, 27 Tenn. 412, 413 (1847). Thus, proof of ownership may include evidence regarding (1) the circumstances surrounding the property's acquisition; (2) the official registration of title to the property; (3) all aspects of insuring the property; (4) the parties' financial stake in the property; (5) the actual possession of the property; (6) the responsibility for bearing the expense of operating and maintaining the property; and (7) the control over the use and disposition of the property. *See Cunningham*, 1997 WL 266851, at *2; *see also Ingram v. Phillips*, 684 S.W.2d 954, 957 (Tenn. Ct. App. 1984) (affirming a finding that decedent was the owner of several vehicles in the possession of defendant when the decedent had listed the vehicles on his personal financial statement, insured and registered them in his name, paid the insurance premiums, sold one vehicle, depreciated one vehicle on his tax return, and paid for one vehicle with his funds). Intangible property includes "a person's 'business,' a corporate name, a trade name and the good will of a business." *State ex rel. Elvis Presley Int'l Mem'l Found.*, 733 S.W.2d at 97 (citations omitted). Proof of trade name ownership includes evidence of prior appropriation and use in trade. *Men of Measure Clothing, Inc. v. Men of Measure, Inc.*, 710 S.W.2d 43, 45 (Tenn. Ct. App. 1985) (citations omitted). "Such use need not have gained wide public recognition, . . . and even a single use in trade may sustain trade mark rights if followed by continuous commercial utilization." *Id.* (quoting *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1265 (5th Cir. 1975)).

After reviewing the record, we find ample material evidence to support the jury's finding that Mr. Walker was the owner of the Stainmaster business. It was undisputed that Mr. Walker performed carpet cleaning services for over a decade before 2013. Mr. Walker testified that he came up with the Stainmaster name on his own and began using it to market his business in 2012, several months before Mr. Fulner became involved. His testimony was corroborated by documentary evidence. Thus, there was material evidence from which the jury could conclude that the Stainmaster name belonged to Mr. Walker when he entered into the agreement with Mr. Fulner.

Moreover, the record contains evidence that several of Stainmaster's clients had been Mr. Walker's clients for many years prior to Mr. Fulner's involvement. Thus, the key question was whether Mr. Walker's agreement with Mr. Fulner included a conveyance of the Stainmaster name and the goodwill associated with it. Both men denied that the business was a partnership, and the only evidence regarding their agreement was their testimony. In essence, Mr. Walker testified that he placed the finances of his pre-existing business in the hands of Mr. Fulner in consideration for the

loans from MCM and Ms. Fulner, with the understanding that Mr. Fulner would give control back to Mr. Walker when the loans were repaid. According to Mr. Fulner, Mr. Walker went to work for Mr. Fulner as general manager of a new business in consideration for a salary and the promise of splitting any profit from the eventual sale of the business. It is evident from the jury's verdict that it did not believe Mr. Fulner's version of events.

Assuming as true that the Stainmaster name belonged to Mr. Walker and he was not an employee of Mr. Fulner, it naturally follows that all the revenue generated from Stainmaster's carpet cleaning services belonged to Mr. Walker. This is significant because all of Stainmaster's vehicles, equipment, supplies, and expenses were paid for with Stainmaster's revenue or with loans that were paid off with Stainmaster's revenue. Thus, Mr. Fulner had no equitable right to Stainmaster's assets. To the extent Mr. Fulner took possession of or title to the assets, he did so under the implied duty to hold the assets for the benefit of Mr. Walker. *See Park*, 27 Tenn. at 413–14 (affirming jury instruction that the presumption of ownership established by proof of possession would yield to any proof that "produced belief in the minds of the jury that title was in another"); *Kilgore v. Kilgore*, No. M2006-00495-COA-R3-CV, 2007 WL 2254568, at *6 (Tenn. Ct. App. Aug. 1, 2007) (finding the presumption of ownership established by recorded deeds was refuted by evidence that the husband "retained control and ownership" over the property); *cf. St. Clair v. Evans*, 857 S.W.2d 49, 50–51 (Tenn. Ct. App. 1993) (affirming the trial court's finding that property titled to one party was being held in trust based upon testimony that the property was conveyed to be used as collateral for a loan with the understanding that it would be returned after the loan was repaid).

In *Browder v. Hite*, 602 S.W.2d 489 (Tenn. Ct. App. 1980), we considered a case, similar to the one at bar, where the parties' testimony about their oral agreement was diametrically opposed. We made the following observation:

> As it may be seen this case turns primarily on the credibility of witnesses. This is not a case of each party attempting to do his or her best in recalling what took place or what was said. Such cases are not really "credibility of witnesses" cases, but are cases where the evidence preponderates that one event as opposed to another is more likely to have occurred, assuming everyone is telling the truth. In the instant case, someone is simply not telling the truth and the case turns on that point.

*Id.* at 495. When reviewing a jury's verdict, we "do not recalibrate the jury's preponderance of the evidence assessment" or reevaluate credibility determinations. *Ferguson v. Middle Tennessee State Univ.*, 451 S.W.3d 375, 380 (Tenn. 2014). Accordingly, "[w]here there is material evidence to support the verdict, the judgment will be affirmed even though the testimony of one or more witnesses supports a contrary

verdict." *Higgins v. Channel Five Televison Co.*, No. 89-127-II, 1989 WL 115217, at *1 (Tenn. Ct. App. Oct. 4, 1989) (citing *City of Chattanooga v. Ballew*, 354 S.W.2d 806 (Tenn. Ct. App. 1961); T.R.A.P. Rule 13(d)).

Based on the foregoing, we find there was material evidence to support the jury's finding that the Stainmaster business belonged to Mr. Walker.

## III.    AWARD OF DAMAGES

In the alternative, Defendants contend that the trial judge committed an "abuse of discretion" by denying their request for remittitur. Yet, "[w]here the trial judge has approved the verdict in its role as thirteenth juror," our "ability to suggest a remittitur is limited to a review of the record to determine whether the verdict is supported by material evidence." *Meals ex rel. Meals*, 417 S.W.3d at 422 (citing *Poole v. Kroger Co.*, 604 S.W.2d 52, 54 (Tenn. 1980)). Accordingly, our "authority to suggest a remittitur when the trial court has affirmed the verdict is far more circumscribed than that of the trial court." *Id.* at 423 (citing *Coffey v. Fayette Tubular Prod.*, 929 S.W.2d 326, 331 & n.2 (Tenn. 1996)). "It is not our role to second-guess the jury and to substitute our judgment; but it is our role to protect against a verdict that is excessive." *Id.* at 425.

Defendants contend Plaintiffs were entitled to only a nominal amount for damages because there was "no credible proof to support the award of $175,000 . . . for damages incurred as a result of the ownership dispute and lost business" and because Plaintiffs failed to show a decrease in Mr. Walker's income caused by the loss of clients. However, as we explained above, we do not reevaluate credibility determinations on appeal. *See Ferguson*, 451 S.W.3d at 380. Moreover, we find Plaintiffs' alleged failure to show a decrease in Mr. Walker's income irrelevant, as there was ample evidence to support the award of $175,000 based on Mr. Fulner's actions.

"A plaintiff may be compensated for any economic or pecuniary losses that naturally result from the defendant's wrongful conduct." *Meals ex rel. Meals*, 417 S.W.3d at 419 (citing *Inland Container Corp. v. Mar.*, 529 S.W.2d 43, 44 (Tenn. 1975)). Besides economic damages, a plaintiff may recover non-economic damages, including "pain and suffering . . . and loss of enjoyment of life." *Id.* at 420 (quoting *Elliott v. Cobb*, 320 S.W.3d 246, 248 n.1 (Tenn. 2010)); *see also Dorsett Carpet Mills, Inc. v. Whitt Tile & Marble Distrib. Co.*, 734 S.W.2d 322, 325 (Tenn. 1987) (providing that a party injured by tortious interference with a business relationship is entitled to damages for "emotional distress or actual harm to reputation, if they are reasonably expected to result from the interference" (quoting Restatement (Second) of Torts § 774A (1979))). "[A] plaintiff is generally not required to prove the monetary value of non-economic damages." *Meals ex rel. Meals*, 417 S.W.3d at 420. "A jury has wide latitude in assessing non-economic damages," and we trust the jurors "to use their personal experiences and sensibilities." *Id.* at 425. We find the jury's award of $175,000 in

damages resulting from the ownership dispute and tortious interference is justified by evidence of economic and non-economic damage to Plaintiffs.

First, Plaintiffs also put forth evidence from which the jury could have concluded that Mr. Fulner misappropriated funds by paying himself and Dynamark $26,851.67 from the Stainmaster Account. Although Mr. Fulner testified that the payments to Dynamark were in consideration for printing services, only one invoice from Dynamark was entered into evidence. Moreover, Mr. Walker testified that Stainmaster cleaned Dynamark's carpets in exchange for printing services. Mr. Fulner's only explanation for the payments he made to himself was that he was entitled to them as "owner" of the business. Besides these payments, the Stainmaster Account contained $16,179.64 when Mr. Fulner "fired" Mr. Walker in February 2015.

Second, Plaintiffs presented evidence to support an award of compensatory damages for lost profits. The best evidence of lost profits is a comparison of the injured party's revenue and expenses before and after the wrongdoing. *Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 59 (Tenn. Ct. App. 2004) (citations omitted). "Since lost profits can rarely be computed down to the last penny, the evidence needed to support an award for lost profits need only provide a reasonable or rational basis for calculating what the lost profits would have been." *Id.* (citations omitted). The record shows that Stainmaster had revenue of approximately $250,000 and expenses of approximately $235,000 in 2014. Included in those expenses is $46,000 paid to Mr. Walker and $11,000 of the approximate $27,000 misappropriated by Mr. Fulner. Giving Mr. Walker credit for these payments,[7] we conclude that there was evidence that Stainmaster had expenses of approximately $178,000 and a net profit of approximately $72,000 in 2014. This represents a profit margin of 29%. The record also shows that Stainmaster's revenue declined by approximately $90,000 in 2015 and stayed at the same level in 2016 and 2017.[8] Thus, we find there was sufficient evidence for the jury to find that Mr. Walker lost profits of approximately $60,000, or $20,000 per year, during these three years.

---

[7] Because a sole proprietorship and its owner are "one and the same," *Ferguson v. Jenkins*, 204 S.W.3d 779, 786 (Tenn. Ct. App. 2006), we have excluded Mr. Walker's salary as an expense in our comparison.

[8] Plaintiffs sought lost profits for 2015, 2016, and 2017 based on the testimony of clients that they would not do business with Stainmaster until the litigation was resolved.

Finally, we also find there was sufficient evidence to support an award of non-economic damages.[9] Mr. Walker testified that the carpet cleaning business had been his sole source of income since he was 15 years old. His wife, Lesa Walker, described the business as Mr. Walker's "baby" that was "ripped . . . away from him." Mr. Walker also testified that he suffered from severe stress as a result of the three years he had to spend fighting the lawsuit and trying to recover his business. The stress strained his relationships with his wife, children, and friends, and he testified that he spent four days in the hospital for stress-related injuries. Mr. Walker's wife testified that Mr. Walker was "a different man," and she had never seen her husband "so hurt and so broke down."

In summary, we find the record contains material evidence to support the award of $175,000 in damages to compensate Plaintiffs for Mr. Fulner's attempts to take control of the Stainmaster business and his interference with Mr. Walker's business relationships.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against appellants.

_____
FRANK G. CLEMENT JR., P.J., M.S.

---

[9] The jury verdict form did not itemize economic and non-economic damages; however, the jury was instructed, without objection from the Defendants, that mental and emotional distress were elements to consider when assessing damages.