# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### February 6, 2014 Session

## JIM FERGUSON v. MIDDLE TENNESSEE STATE UNIVERSITY

**Appeal by Permission from the Court of Appeals, Middle Section**
**Chancery Court for Rutherford County**
**No. 036336MI     John D. Wootten, Jr., Judge**

_____

### No. M2012-00890-SC-R11-CV - Filed October 29, 2014

_____

A jury found that an employer retaliated against an employee in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Tennessee Human Rights Act ("THRA") and awarded the employee compensatory damages. The Court of Appeals reversed the award, holding that the employee had failed to prove that his supervisor had knowledge of his protected activity when she took adverse action against him. We hold that the jury's verdict is supported by material evidence from which the jury could infer that the supervisor knew that the employee had filed a lawsuit for discrimination when she engaged in retaliatory conduct. We reverse the decision of the Court of Appeals, reinstate the jury verdict, and remand to the Court of Appeals for a review of the award of damages.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed; Case Remanded to the Court of Appeals**

SHARON G. LEE, C.J., delivered the opinion of the Court, in which CORNELIA A. CLARK, GARY R. WADE, and WILLIAM C. KOCH, JR., JJ., joined. JANICE M. HOLDER, J., not participating.

Michelle M. Benjamin, Winchester, Tennessee, for the appellant, Jim Ferguson.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; William J. Marett, Jr., and Leslie Ann Bridges, Senior Counsel, for the appellee, Middle Tennessee State University.

## OPINION

## I.

A jury awarded compensatory damages to Jim Ferguson after finding that his employer, Middle Tennessee State University ("MTSU"), through the actions of its supervisor, retaliated against Mr. Ferguson for filing a discrimination suit against MTSU. The jury verdict was based on violations of Title VII, 42 U.S.C. § 2000e-3 (2006), and the THRA, Tenn. Code Ann. § 4-21-301 (1978), which prohibit employers or their agents from retaliating against employees who engage in protected activity, such as the filing of an employment discrimination lawsuit. To prove his retaliation claim, Mr. Ferguson was required to show that he engaged in protected activity, that MTSU knew about his protected activity, that MTSU took a materially adverse action against him, and that there was a causal connection between his protected activity and the resulting adverse action. This appeal concerns the knowledge requirement – whether the verdict is supported by material evidence that MTSU, through its supervisor, knew that Mr. Ferguson had filed a lawsuit before the supervisor increased his work duties and required him to perform work that he was not physically capable of performing.

Mr. Ferguson, a Japanese-American, began working for MTSU in May of 1987. Beginning in 1997, he worked in the Housing Department under the supervision of Ms. Dana Byrd. Mr. Ferguson and Ms. Byrd initially had a good relationship, but it deteriorated over time. Mr. Ferguson believed this was because Ms. Byrd discovered that Mr. Ferguson's mother was Japanese and that he was Japanese-American.

On December 29, 1998, Mr. Ferguson had shoulder surgery. When he returned to work in February of 1999, Mr. Ferguson's doctor placed restrictions on the work he could perform. Ms. Byrd, however, directed him to do work that exceeded his medical restrictions. She told Mr. Ferguson to perform the work or go home. Mr. Ferguson continued to work because he had a son with medical problems and needed the job for health insurance.

In March of 1999, Mr. Ferguson complained to Karen Milstead, a benefits specialist with MTSU's Human Resources Department, about being required to perform tasks that exceeded his medical restrictions. After Mr. Ferguson provided Ms. Milstead with a copy of his medical restrictions, his work requirements decreased for a period of time. On a subsequent occasion, Mr. Ferguson was required to lift and install heavy air conditioning units. Mr. Ferguson could not perform this work so he requested a transfer to another department. Ms. Byrd denied his transfer request.

On Friday, August 9, 2002, Mr. Ferguson injured his shoulder and back at work. After receiving medical care and a new set of work restrictions, he took the restrictions to Ms. Byrd's office. She advised Mr. Ferguson that he would need to report to work over the weekend and that his duties would comply with the restrictions. Mr. Ferguson testified that he could barely walk, but Ms. Byrd still had him perform some overhead tasks that weekend. On Monday, he informed Ms. Byrd that his leg was feeling numb and he needed to see a doctor. His condition required him to have back surgery, and he was out of work until March 17, 2003. When Mr. Ferguson returned to work, he was placed in a warehouse performing tasks within his medical restrictions.

In late 2002, Mr. Ferguson filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination on the basis of race and national origin, and that he was subjected to a hostile workplace. On March 27, 2003, Mr. Ferguson filed an employment discrimination lawsuit against MTSU in the Rutherford County Chancery Court. Mr. Ferguson alleged discrimination on the basis of disability, race, and national origin under the Americans with Disabilities Act, Title VII, the THRA, and the Tennessee Handicap Act.[1] On April 3, 2003, MTSU was served with a copy of Mr. Ferguson's employment discrimination lawsuit. Mr. Ferguson testified that after he filed his lawsuit, "things got pretty heated and pretty rough."

On April 7, 2003, four days after MTSU was served with Mr. Ferguson's lawsuit, Ms. Byrd ordered Mr. Ferguson to do tasks that required physical labor beyond his medical restrictions.

On April 22, 2003, Mr. Ferguson received work restrictions from his doctor that included limited overhead work with his right shoulder and only occasional lifting over twenty pounds. The next day, Ms. Byrd ordered Mr. Ferguson to convert the exterior lights on all campus buildings to flood lights. On April 24, 2003, Ms. Byrd required Mr. Ferguson to replace, repair, and check all exit lights in every dormitory on the MTSU campus. This required him to perform overhead work that exceeded his restrictions.

On May 14, 2003, Ms. Milstead sent an e-mail to Sarah Sudak, an associate dean, with copies to Ms. Byrd and her supervisor, Richard Smith, indicating that Mr. Ferguson's lifting restrictions had been modified. Ms. Byrd acknowledged that she should have sent Mr. Ferguson home that day, but she did not. She also admitted that she believed Mr. Ferguson's injuries were genuine and that he was not exaggerating them.

---

[1] Effective April 7, 2008, the Tennessee Handicap Act was renamed the Tennessee Disability Act. *See* Tenn. Code Ann. § 8-50-103(a) (2008).

On May 19, 2003, Mr. Ferguson had an incident with a co-worker. Mr. Ferguson said that the co-worker threatened him and that MTSU campus police were called. In a letter to Mr. Smith about the incident, Mr. Ferguson stated that his job duties were causing him severe pain and increasing the numbness in his legs. After Mr. Ferguson gave a copy of his letter to Ms. Byrd, Mr. Ferguson believed that Ms. Byrd treated him worse.

On Sunday, June 1, 2003, while Mr. Ferguson was in church with his family attending his son's confirmation, Ms. Byrd called him into work, refusing to allow him to report after the service ended. Upon arriving at work, Mr. Ferguson was required to unstop a drain filled with a highly corrosive acid. He believed that Ms. Byrd was trying to hurt him by failing to warn him about the acid. Mr. Ferguson was not able to unstop the drain, and when another worker came to assist him, they determined that the job required an auger, which weighed between seventy-five and one hundred pounds. After retrieving the auger, Mr. Ferguson and his co-worker tried to unstop the drain, but Mr. Ferguson had to leave because his leg became numb. The next day, Ms. Byrd ordered him to finish the job.

On June 11, 2003, Mr. Ferguson was having some physical difficulties performing his work and asked Ms. Byrd to provide him with assistance. She denied his request, and Mr. Ferguson had to perform the work alone. Later that day, Mr. Ferguson fell down a flight of stairs, injuring his leg and suffering a concussion. Mr. Ferguson's head struck multiple steps during his fall, causing him to lose consciousness. He was transferred by ambulance to the hospital. According to a subsequent medical diagnosis, he sustained a brain injury.

When he returned to work on June 16, 2003, Mr. Ferguson received thirty-nine work orders; on June 18, 2003, he received fifty-three work orders. Many of these tasks required Mr. Ferguson to perform overhead work, even though these tasks exceeded his restrictions. His medical condition continued to deteriorate, and Mr. Ferguson left MTSU in December of 2003. He was approved for accidental disability retirement on June 22, 2004.

On April 21, 2004, Mr. Ferguson filed another lawsuit against MTSU in the Rutherford County Chancery Court, alleging unlawful retaliation under Title VII and the THRA. In December of 2004, this lawsuit was consolidated with the discrimination suit he had previously filed. In 2008, he filed an amended complaint that included the previously filed discrimination and retaliation claims and also added a claim for malicious harassment under the THRA.

For eight days in November of 2011, a jury heard the case on Mr. Ferguson's claims of discrimination, malicious harassment, and retaliation.[2] His discrimination claim was based on two theories—a disparate treatment claim and a hostile work environment claim alleging workplace harassment—both involving his Japanese-American heritage. At the conclusion of Mr. Ferguson's proof, MTSU moved for a directed verdict pursuant to Tennessee Rule of Civil Procedure 50.01. The trial judge granted the motion as to Mr. Ferguson's hostile work environment claim but denied it as to all other claims. The jury found in favor of MTSU on Mr. Ferguson's disparate treatment and malicious harassment claims, but found in favor of Mr. Ferguson on his retaliation claim and awarded him three million dollars in damages.

On December 21, 2011, MTSU filed a motion for a new trial and/or a remittitur, contending that Mr. Ferguson failed to show that Ms. Byrd knew of his protected activity and, therefore, did not retaliate within the meaning of Title VII and the THRA. After a hearing, the trial court denied MTSU's motion, ruling that there was substantial evidence supporting the jury's verdict.

MTSU appealed, and the Tennessee Court of Appeals reversed the trial court's decision. *Ferguson v. Middle Tenn. State Univ.*, No. M2012-00890-COA-R3-CV, 2013 WL 1304490, at *1 (Tenn. Ct. App. Mar. 28, 2013). The Court of Appeals noted that it was undisputed that some persons in MTSU's administration knew of Mr. Ferguson's EEOC complaint and lawsuit. *Id*. at *8. However, the Court of Appeals rejected the view that general corporate knowledge of an employee's protected activity is sufficient to establish the knowledge requirement of a prima facie case of retaliation. *Id*. Thus, the Court of Appeals concluded that Mr. Ferguson failed to submit to the jury material evidence showing that Ms. Byrd personally knew of his lawsuit at the time she took adverse action against him. *Id*. at *9. Mr. Ferguson filed an application for permission to appeal under Tennessee Rule of Appellate Procedure 11, which we granted. The issue we review is whether the jury verdict was supported by material evidence that MTSU had knowledge of Mr. Ferguson's protected activity prior to the adverse action taken against him.

## II.

In reviewing the sufficiency of a civil jury verdict, we will set aside findings of fact by a jury "only if there is no material evidence to support the verdict." Tenn. R. App. P.

---

[2] No issue was raised as to whether Mr. Ferguson was entitled to a jury trial on the THRA claim. *But see Sneed v. City of Red Bank*, No. E2012-02112-COA-R9-CV, 2013 WL 3326133 (Tenn. Ct. App. June 27, 2013), *perm. app. granted* (Tenn. Nov. 13, 2013).

13(d); *see also Wilson v. Americare Sys., Inc.*, 397 S.W.3d 552, 558 (Tenn. 2013). To determine whether there is such material evidence, we "(1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence." *Creech v. Addington*, 281 S.W.3d 363, 372 (Tenn. 2009) (alteration in original) (quoting *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704 (Tenn. 2000) (internal quotation marks omitted), *abrogated by Gossett v. Tractor Supply Co.*, 320 S.W.3d 777 (Tenn. 2010). We do not re-weigh the evidence, *Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521, 532 (Tenn. 2008), and do not recalibrate the jury's preponderance of the evidence assessment, *Barnes,* 48 S.W.3d at 704. The credibility of witnesses is the province of the jury, not appellate courts. *See, e.g.*, *State v. Flake*, 88 S.W.3d 540, 554 (Tenn. 2002) ("Questions concerning the credibility of witnesses, the weight and value of the evidence, as well as all factual disputes raised by the evidence, are for the trier of fact; appellate courts do not reweigh the evidence or reevaluate credibility determinations."); *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn. 1994).

**III**.

Both Title VII and the THRA prohibit retaliation against employees who oppose discriminatory practices in the workplace. Title VII makes it unlawful "for an employer to discriminate against any of his [or her] employees or applicants for employment . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). This is known as Title VII's "opposition clause" because it prohibits the punishment of employees who oppose unlawful employment practices. *See, e.g., Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 271 (2009).

The THRA similarly prohibits employers from "[r]etaliat[ing] or discriminat[ing] in any manner against a person because such person has opposed a practice declared discriminatory by [the THRA] or because such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing under [the THRA]." Tenn. Code Ann. § 4-21-301(a)(1). The stated purpose of the THRA is to "[p]rovide for execution within Tennessee of the policies embodied" in Title VII and other federal civil rights laws. Tenn. Code Ann. § 4-21-101(a)(1) (2011); *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996). Generally, we interpret the THRA similarly, if not identically, to Title VII, but we are not obligated to follow and we are not limited by federal law when interpreting the THRA. *Booker v. Boeing Co.*, 188 S.W.3d 639, 647 (Tenn. 2006); *Washington v. Robertson Cnty.*, 29 S.W.3d 466, 474 (Tenn. 2000); *Carr v. United Parcel Serv.*, 955 S.W.2d 832, 835 (Tenn. 1997), *overruled on other grounds by Parker v. Warren Cnty. Util. Dist.*, 2 S.W.3d 170 (Tenn. 1999). Like Title VII, the THRA is a

remedial piece of legislation that should be construed liberally. *Emerson v. Oak Ridge Research, Inc.*, 187 S.W.3d 364, 377 (Tenn. Ct. App. 2005).

A primary purpose of the anti-retaliation provision of Title VII is to ensure employees "unfettered access to statutory remedial mechanisms." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997); *see also Perkins v. Metro. Gov't of Nashville & Davidson Cnty.*, 380 S.W.3d 73, 81 (Tenn. 2012). It is designed to prohibit employer actions that are likely to deter employees from filing complaints with the EEOC or otherwise asserting their rights under anti-discrimination statutes. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citing *Robinson*, 519 U.S. at 346). The anti-retaliation provision of the THRA serves the same purpose. *See Allen v. McPhee*, 240 S.W.3d 803, 820 (Tenn. 2007), *abrogated on other grounds by Gossett v. Tractor Supply Co.*, 320 S.W.3d 777 (Tenn. 2010). If employees do not receive protection from retaliatory conduct after they complain about discrimination, they will be less likely to report discriminatory conduct. "To a large extent, the effectiveness and very legitimacy of discrimination law turns on people's ability to raise concerns about discrimination without fear of retaliation." Deborah L. Brake, *Retaliation*, 90 Minn. L. Rev. 18, 20 (2005). Without protection from retaliation, "challenging employment discrimination would be nearly impossible." Henry L. Chambers, Jr., *The Supreme Court Chipping Away at Title VII: Strengthening It or Killing It?*, 74 La. L. Rev. 1161, 1180 (2014).

An employee may have a valid retaliation claim even if the underlying discrimination claim fails. *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1457-58 (7th Cir. 1994); *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 642 (2d Cir. 1986) ("A finding of unlawful retaliation is not dependent on the merits of the underlying discrimination complaint."). As long as the employee in good faith believes he or she is a victim of discrimination, the employee is protected by the anti-retaliation provisions of Title VII. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579-80 (6th Cir. 2000); *Spence v. Local 1250, United Auto Workers of Am.*, 595 F. Supp. 6, 10 (N.D. Ohio 1984); *Croushorn v. Bd. of Trustees of Univ. of Tenn.*, 518 F. Supp. 9, 25 (M.D. Tenn. 1980); *Smith v. Winter Place LLC*, 851 N.E.2d 417, 419 n.4 (Mass. 2006).

Federal and state courts recognize that retaliation comes in many shapes and sizes. "The law deliberately does not take a 'laundry list' approach to retaliation, because unfortunately its forms are as varied as the human imagination will permit." *Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996). The United States Supreme Court has acknowledged that effective retaliation can take many forms. *White*, 548 U.S. at 64. Many courts have recognized that increasing an employee's workload can constitute retaliation. *See Mogenhan v. Napolitano*, 613 F.3d 1162, 1166-67 (D.C. Cir. 2010) (finding an increase in an employee's workload by five or six times sufficient to present a jury question as to unlawful

retaliation under Title VII); *Ford v. Gen. Motors Corp*., 305 F.3d 545, 555 (6th Cir. 2002) (finding increased workload as one of three factors causing court to find jury question on retaliation); *Scruggs v. TRW Auto. U.S. LLC*, 3:07-0923, 2008 WL 4791531, at *14 n.8 (M.D. Tenn. Oct. 30, 2008) ("It is possible for an employer to discriminate or retaliate against an employee by giving that employee an onerous workload.").

To prevail on a THRA claim, an employee must prove: (1) that the employee engaged in protected activity; (2) that the employer knew about the employee's protected activity; (3) that the employer subsequently took a materially adverse action against the employee; and (4) a causal connection between the employee's protected activity and the resulting adverse action. *Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 29 (Tenn. 2011); *Allen*, 240 S.W.3d at 820.[3]  Our focus in this case is the knowledge requirement.  The rationale for the knowledge requirement is that an employer should not be held liable for retaliation when it has no knowledge that the employee has engaged in protected activity.  Matthew W. Green, Jr., *Express Yourself: Striking a Balance Between Silence and Active, Purposive Opposition Under Title VII's Anti-Retaliation Provision*, 28 Hofstra Lab. & Emp. L.J. 107, 131 (2010).  Knowledge of an employee's protected activity can be shown by either direct or circumstantial evidence. *Mulhall v. Ashcroft,* 287 F.3d 543, 552 (6th Cir. 2002); *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993); *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009).

MTSU asserts that Mr. Ferguson failed to show that Ms. Byrd, his supervisor, knew that he had filed a discrimination lawsuit when she increased his work duties beyond his physical capabilities and medical restrictions.  Mr.  Ferguson contends that he satisfied his burden of proof by submitting evidence of Ms. Byrd's knowledge of his protected activity through her deposition testimony.  In her deposition, Ms. Byrd testified that she didn't "really remember for sure" but believed Mr. Ferguson had filed two complaints and that they had to do with his mother being Japanese.  This deposition testimony proves that at some point in time, Ms. Byrd knew that Mr. Ferguson had engaged in protected activity, but fails to prove *when* she acquired this knowledge.  However, there was additional proof from which the jury could infer when Ms. Byrd learned about the lawsuit.  When Mr. Ferguson returned to work on March 17, 2003, he was assigned work in the warehouse within his medical restrictions.  On April 3, 2003, MTSU was served with Mr. Ferguson's lawsuit.  Less than a week later, Ms. Byrd increased Mr. Ferguson's work duties beyond his work restrictions.  The close temporal proximity of the service of the lawsuit on MTSU and the

---

[3] The United States Court of Appeals for the Sixth Circuit identifies the same four prongs of a retaliation claim under Title VII. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000); *Canitia v. Yellow Freight Sys., Inc*., 903 F.2d 1064, 1066 (6th Cir. 1990).

increase in Mr. Ferguson's work duties could be considered by the jury in determining not if, but when, Ms. Byrd acquired the requisite knowledge. Close temporal proximity, by itself, is not enough to prove knowledge, but can be considered by the jury, along with other direct or circumstantial evidence of knowledge, to support an inference that the employer had the requisite knowledge.

The jury had the benefit of seeing and hearing Mr. Ferguson and Ms. Byrd testify and was free to judge the credibility of both witnesses. *Barnes*, 48 S.W.3d at 709. Credibility of witnesses plays a major role in retaliation cases, as the jury is in a unique position to observe the demeanor of witnesses and assess their credibility. *Patton v. Sears, Roebuck & Co.*, 234 F.3d 1269, 2000 WL 1681017, at *7 (6th Cir. Nov. 1, 2000) (unpublished table decision). The jury can disregard the testimony of a witness it does not find to be credible. *State v. Cribbs*, 967 S.W.2d 773, 793 (Tenn. 1998); *Buchanan v. Harris*, 902 S.W.2d 941, 943 (Tenn. Ct. App. 1995); *see Cunningham v. Black & Decker (U.S.)*, No. 05-1297-T-AN, 2007 WL 8042502, at *4 (W.D. Tenn. Dec. 7, 2007) (finding that the jury reasonably disregarded testimony of decisionmaker who claimed he did not know of employee's workers' compensation claim); *Liberatore v. CVS N.Y., Inc.*, 160 F. Supp. 2d 114, 117-18 (D.D.C. 2001) (acknowledging that because resolution of factual issues depends on the jury's assessment of credibility, the jury was free to disregard testimony of employer's witnesses who claimed ignorance of protected activity of whistleblowing employee). The jury could have reasonably found that Ms. Byrd was not a credible witness and that there was circumstantial evidence that Ms. Byrd knew that Mr. Ferguson had filed a lawsuit before she materially increased his work load.

On factual questions, members of a jury can use their common sense and rely on everyday life experiences when evaluating issues.[4] *Lake v. Memphis Landsmen, LLC*, 405 S.W.3d 47, 67 (Tenn. 2013); *see also Terry v. Plateau Elec. Coop.*, 825 S.W.2d 418, 423 (Tenn. Ct. App. 1991) ("Jurors do not live in vacuums. They are encouraged to use their common sense and to rely upon their life experiences in evaluating a lawsuit."). The jury was free to find that Ms. Byrd was not credible. Other witnesses directly contradicted aspects of Ms. Byrd's testimony. For example, a former employee of MTSU who worked in the warehouse testified that Ms. Byrd called Mr. Ferguson blind, dumb, and stupid, but Ms. Byrd testified she did not make that statement.

The jury also was free to disbelieve Ms. Byrd's testimony that she did not retaliate against Mr. Ferguson because he had filed a discrimination lawsuit. *See Reed v. Cracker Barrel Old Country Store, Inc.*, 133 F. Supp. 2d 1055, 1074 (M.D. Tenn. 2000) ("A

_____

[4] The jury instructions in this case provided: "In deciding which testimony you believe, you should rely on your own common sense and everyday experience."

reasonable jury could find that the [employer's] explanation in this case is not credible."). Ms. Byrd testified in her deposition that she thought that Mr. Ferguson's discrimination suit had something to do with the fact that his mother was Japanese. However, she followed that up with the comment, "I really don't remember anything." The jury could choose to disbelieve this testimony as well. Appellate courts are not in the business of second-guessing jurors and trial judges when it comes to factual determinations supported by material evidence. We have explained that whether we "would have made the same credibility assessments or findings of fact that the jury did in this case is of no consequence. The assessment of witness credibility and resolution of evidentiary conflicts was within the sole province of the jury." *Barnes*, 48 S.W.3d at 709.

We find that the Court of Appeals erred in substituting its judgment for that of the jury, which had the opportunity to evaluate the credibility of both Mr. Ferguson and Ms. Byrd. Taking the strongest legitimate view of the evidence and allowing all reasonable inferences in favor of Mr. Ferguson, as we must given the jury verdict in his favor, we find there was material evidence supporting the jury verdict.

MTSU also asserts that the compensatory damages award of three million dollars is excessive. Because the issue of damages has not been reviewed by the Court of Appeals, we remand the case to the Court of Appeals for a review of the damages award.

## CONCLUSION

Because we find that the jury's verdict is supported by material evidence, we reverse the decision of the Court of Appeals and reinstate the jury verdict. The case is remanded to the Court of Appeals for review of the award of compensatory damages. Costs of this appeal are taxed to Middle Tennessee State University for which execution may issue if necessary.

_____
SHARON G. LEE, CHIEF JUSTICE

-10-