IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 7, 2021 Session

## TMS CONTRACTING, LLC v SMITHGROUP JJR, INC. ET AL.

**Appeal from the Chancery Court for Montgomery County**
**No. DT-15-3  Laurence M. McMillan, Jr., Chancellor**

———————————————————

**No. M2020-01028-COA-R3-CV**

———————————————————

The general contractor on a park and marina project brought a professional negligence action against the engineering firm that designed the project and administered the construction contract. The jury returned a verdict for the general contractor. And the trial court approved the verdict. On appeal, the engineering firm argues that it is entitled to a new trial. It contends that: (1) the jury verdict must be set aside because it is irreconcilably inconsistent; (2) the general contractor's expert witness was not qualified to testify on the engineering standard of care; (3) and there is no material evidence to support the jury's findings as to liability or delay damages. Discerning no reversible error, we affirm.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY D. BENNETT and JOHN W. MCCLARTY, JJ., joined.

Robert H. Green and Michael S. Kelley, Knoxville, Tennessee, and Kevin J. Gleeson, Southfield, Michigan, for the appellant, SmithGroup JJR, Inc.

Gregory L. Cashion and J. Ross Hutchison, Nashville, Tennessee, for the appellee, TMS Contracting, LLC.

**OPINION**

**I.**

**A.**

SmithGroup JJR, Inc., an architectural and engineering company, designed a large park and marina complex for the City of Clarksville. The project spanned 131 acres near the Cumberland River. The City retained TMS Contracting, LLC as the general contractor for the first three phases of the project.

SmithGroup also oversaw construction of the project. It was SmithGroup's responsibility to observe the work in progress and "make a judgment" about whether it met the contract specifications. Jessie Fink, a landscape architect, was the project manager for SmithGroup. During construction, she was in daily communication with the resident project representative.[1] And she personally visited the job site about once a month. During each visit, she alerted City representatives of any installed work she believed fell short of the contract specifications. She documented her observations in written field reports. For major problems, she issued TMS a formal notice of nonconformance.

After the project was completed, TMS sued SmithGroup[2] for professional negligence in the design and administration of the project. SmithGroup denied liability and asserted comparative negligence.

The jury heard testimony from multiple fact witnesses but only one expert. The expert witness was offered by TMS. SmithGroup did not offer any expert testimony.

Thom Spigner, the owner of TMS, explained this was a "very large, complex project." TMS began work in 2009 and obtained final acceptance of all three phases in April 2012. During that time, the contractor excavated a 28-acre marina, created a 10-acre fishing pond, and installed miles of underground utilities. It also built a four-lane boat ramp, two bridges, and six buildings and completed several miles of walking trails, roads, and parking lots.

Mr. Spigner acknowledged that his company made its share of mistakes along the way. But "others did as well." Kyle Jones, project manager for TMS, echoed that sentiment: "I'm not saying we were perfect on this project. Any time there was a mistake,

---

[1] SmithGroup subcontracted with Westbrook Associated Engineers, Inc. to act as the resident project representative. A Westbrook employee was on site almost every day.

[2] TMS also sued two other entities. TMS voluntarily dismissed its claims against one, and the other is not a party to this appeal. Thus, we focus on the facts relevant to the claims against SmithGroup.

2

we corrected it." TMS's claims against SmithGroup were limited to five discrete aspects of the project—settlement monitoring at Liberty Plaza; on-site stormwater runoff and erosion; concrete work; walking trails; and the north window wall at Freedom Point Pavilion.

1. Settlement Monitoring

During excavations, SmithGroup learned that the soil in one area of the park was unsuitable for building. The soil report from the City's geotechnical engineer, Earth Science Engineering, LLC, showed a layer of soft sediment that could compress under weight. Because of the instability of the soil, the design for the building structures in that area had to change. Freedom Point Pavilion was built on piles—61-foot steel beams—resting on the underlying bedrock. And, after much discussion between SmithGroup, the City, and Earth Science, "the decision was made" to support Liberty Plaza's retaining walls with piles but let the plaza itself float.

SmithGroup issued a construction bulletin notifying TMS of these design changes. Among other things, the bulletin directed TMS to install settlement monitoring plates in the plaza area. TMS also learned from the bulletin that the geotechnical engineering firm would evaluate the data from the settlement monitoring plates and notify SmithGroup when the contractor could proceed with construction of the plaza. It was anticipated that construction would be delayed for about 60 days. Monitoring began on April 22, 2011. Sixty days later, SmithGroup told TMS that additional monitoring was necessary. Construction on the plaza was delayed indefinitely. Landscaping, sidewalks, and other items in that vicinity were also on hold. But TMS moved forward with construction of the pavilion.

SmithGroup did not release TMS to begin construction of the plaza until January 13, 2012—205 days later than anticipated. Because of increased costs, TMS asked the City to remove Liberty Plaza from its contract. The City agreed.

Mr. Spigner and Mr. Jones complained that settlement monitoring delayed substantial completion of the project for 205 days. According to Mr. Spigner, most of the major work on the project was "all but finished" when the initial 60-day monitoring period expired. But TMS still had to set a bridge, pour concrete, and add stone pavers around the plaza. All of this work required heavy equipment that needed construction access. So TMS could not install landscaping and sidewalks near the plaza. And some items at Freedom Point Pavilion could not be completed. This was a significant component of the project.

Mr. Spigner asserted that "[e]very day . . . we were delayed cost us money." Mr. Jones explained that on a typical project, "[a]s you knock items off the to do list, porta johns can go away. Personnel can go down. General conditions are reduced." The delay

3

on the plaza kept TMS from "cross[ing] items off the list." So its daily overhead costs during the period of delay remained steady at $2,604 per day.

Jerry Clark, TMS's expert witness, faulted SmithGroup for not exploring other options for the construction of the plaza. In his opinion, it was a breach of the standard of care for the project designer to simply accept Earth Science's recommendation of settlement monitoring without considering the impact of the delay on the construction project as a whole.

SmithGroup's project manager, Ms. Fink, claimed that SmithGroup was not responsible for the settlement monitoring delay. Earth Science—the City's geotechnical engineer—proposed this solution. Earth Science reviewed the monthly reports and decided when plaza construction could start.

She also denied that settlement monitoring delayed substantial completion of the project. All that was delayed was the construction of the plaza itself. Other work was being done during this time, including the construction of Freedom Point Pavilion. At some point, SmithGroup even removed the plaza from the substantial completion deadlines. And it allowed the contractor to start work on the landscaping and sidewalks in front of the plaza. TMS poured the sidewalks leading to the plaza in October 2011. It set the bridge in December 2011, shortly before monitoring ended.

2. Erosion Control

TMS also asserted that SmithGroup's erosion control plan was deficient. Excessive water runoff from the paved areas on the site repeatedly ruined TMS's landscaping efforts. SmithGroup did not include curbs or gutters in the project design. And the unchecked water flow continually washed away adjacent grass seed that TMS planted. According to Mr. Spigner and Mr. Jones, the water velocity was so great that it overwhelmed the contractor's erosion controls. TMS tried protective matting, straw, straw wattles, silt fences, and check dams. Nothing worked. TMS devoted "countless man hours and resources" to "re-seeding and re-grading" areas ruined by the excessive water flow. TMS notified SmithGroup about the erosion problem in July 2011. But SmithGroup denied any responsibility for on-site erosion control. The problem continued unabated until TMS installed sod in the affected areas at its own expense.

According to Mr. Jones, TMS incurred $73,794.50 in extra material and labor costs because of SmithGroup's inadequate erosion control plan. By his calculation, the erosion problem also delayed substantial completion of the project by 105 days.

Mr. Clark explained that it was SmithGroup's responsibility to design an erosion control plan for the project. Typically, drainage on a construction site is controlled through a system of curbs and gutters or ditches. SmithGroup did not use these methods. It relied

4

on sheet flow. During construction, the flow velocities exceeded the capabilities of the specified erosion controls. In his opinion, SmithGroup's erosion control plan should have accounted for these high velocities. This failure was a breach of the applicable standard of care.

Ms. Fink maintained that it was the contractor's responsibility to protect the seeded areas. It was not SmithGroup's job to tell TMS how to divert the water. The contract specified a wide variety of erosion controls available for the contractor's use. She claimed the contractor failed to properly install protective matting. And it did not properly maintain other controls it used, such as silt fences and check dams. She showed the jury pictures that she believed illustrated her point. But, on cross-examination, she admitted that the pictures were taken after a flood in late April 2011 caused extensive damage to the park.

Ms. Fink also blamed TMS's landscaping problems on out-of-season planting. The design plan specified the recommended planting windows. Instead, TMS planted cool season grass seed during the summer. Again, she was forced to concede that TMS planted the grass seed in the summer because the April flood had ruined an earlier planting. And the contractor had installed an extensive irrigation system to alleviate the problem of planting out of season.

3. Concrete Connections

TMS poured around three miles of concrete sidewalks throughout the park. Mr. Spigner and Mr. Jones freely acknowledged that some areas of concrete had surface defects or cracking that had to be replaced. But TMS took issue with SmithGroup's insistence that it replace certain concrete connections.

In a few spots, TMS did not connect the sidewalks with the adjacent light poles exactly as specified in the design plans. The specifications showed seamless "little [concrete] popouts" at the base of the light poles. To achieve this result, the contractor needed to pour the concrete for the sidewalk and the popout in one continuous pour. According to Mr. Spigner and Mr. Jones, strict adherence to the design plan was not always logistically possible. Concrete can only be poured during favorable weather. Some sidewalks were poured before the light poles were fully operational. So the contractor could not create the "little pop-outs." Once the light pole was finished, TMS connected it to the sidewalk with a cold joint—a standard industry method.

Ms. Fink required TMS to remove the concrete surrounding the cold-joint connections back to the nearest joint and re-pour the concrete as specified in the plans. Mr. Spigner believed Ms. Fink's decision was punitive. He maintained that the cold-joint connections met industry standards for quality and durability. And the project was nearly finished. Removal of the concrete connections damaged the adjacent landscaping, and

5

TMS had to repair that as well—all at its own expense. Mr. Jones calculated that TMS spent $16,500 removing and replacing these concrete connections.

TMS's expert, Mr. Clark, explained that SmithGroup had a duty to act reasonably in administering the contract. Admittedly, the cold-joint connections did not meet the contract specifications. But this connection method was equally durable. In fact, this type of connection was allowed elsewhere in the park. In his opinion, it was unreasonable to require TMS to remove and replace quality work for mere aesthetics.

Ms. Fink denied being punitive. It was her job to ensure that the installed work met the contract specifications. And she believed that the contractor's connection method was more likely to crack.

4. Asphalt Walking Trails

TMS also installed over 4,000 feet of asphalt walking trails. Mr. Jones acknowledged that some sections were missing radii or had low spots. Those problems were fixed. And none of those costs were included in TMS's claim.

As Mr. Spigner explained, TMS only sought fair compensation for adding a "tennis court resurfacer" to the trails at the City's request. TMS created the walking trails using the binder mix specified in the contract. Binder mix is a coarse ground aggregate with tar. In Mr. Spigner's experience, binder mix was not typically used as a surface coating.

Mr. Spigner claimed that the City was unhappy with the appearance of the completed trails. The City rejected about a third of them. To solve the appearance issue, he suggested adding the resurfacer. The City asked him to add the resurfacer to all the trails for a uniform appearance. He complied. But the City was only willing to pay the cost of resurfacing the accepted trails. Mr. Spigner rejected the offer. He wanted $15,131.25—the cost of adding the resurfacer to all the walking trails.

Mr. Clark agreed that the specified binder mix would not provide a smooth walking surface. As he described it, binder mix is "kind of like a gravel road with tar on it." He would not expect it "to have a nice appearance" or to "consistently appear the same from one section to another." TMS offered to apply the topcoat at a reasonable price. In Mr. Clark's opinion, SmithGroup breached the standard of care by failing to recommend that TMS be paid a fair price for the extra work.

Ms. Fink responded that the problem was not with the binder mix. Rather, it was the contractor's faulty work. The rejected trails had surface defects, incorrect measurements, low spots, or missing radii. And she maintained that the resurfacer was added to fix these problems, not just appearance issues. So she recommended that TMS bear the cost of resurfacing the rejected trails.

4. Attachment of the North Window Wall

Finally, TMS contended that it incurred damages for the delay caused by a dispute over the design for the north window wall at Freedom Point Pavilion. During construction, TMS discovered that the design plan did not specify how to attach the north window wall to the building structure. SmithGroup maintained that this aspect of the design was the contractor's responsibility. Yet it supplied the missing details and approved a change order compensating TMS for the additional work. Mr. Spigner believed that SmithGroup took an inordinate amount of time to provide the missing details. According to Mr. Jones, the north window wall problem delayed construction on Freedom Point Pavilion for 70 days.

Mr. Clark opined that SmithGroup's design for the north window wall failed to meet the applicable standard of care. The standard of care required SmithGroup to provide the contractor with sufficient information to attach the north window wall to the building structure.

## B.

The jury found that SmithGroup breached the applicable standard of care with respect to all five claims. It also found that TMS was not "at fault" with respect to any claim. Even so, when asked to apportion fault, it attributed small percentages of fault on each claim to TMS.

SmithGroup filed multiple motions for a new trial, which were denied. The court determined that apparent inconsistencies in the jury verdict could be reconciled. It reduced the amount of damages assessed by the jury for each claim by the percentages of fault attributed to TMS and entered judgment against SmithGroup in the amount of $427,764.

## II.

SmithGroup contends that the trial court committed a host of reversible errors entitling it to a new trial. It argues that the court erred in approving the jury verdict because it was irreconcilably inconsistent. And it insists that Mr. Clark was not qualified to testify as an expert witness. Finally, it maintains that there is no material evidence to support the jury's findings on liability or the assessment of delay damages.

We review the trial court's denial of a motion for a new trial for an abuse of discretion. *Ali v. Fisher*, 145 S.W.3d 557, 564-65 (Tenn. 2004). A court abuses its discretion when it applies the wrong legal standard, reaches "an illogical or unreasonable decision," or bases its decision "on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).

7

## A. Jury Verdict

If a jury verdict is inconsistent and irreconcilable, we must reverse and remand for a new trial. *See Milliken v. Smith*, 405 S.W.2d 475, 477 (Tenn. 1966). "Litigants are entitled to have their rights settled by a consistent and intelligible verdict." *Tip's Package Store, Inc. v. Com. Ins. Managers, Inc.*, 86 S.W.3d 543, 560 (Tenn. Ct. App. 2001). The jury, "on a single set of facts and circumstances, cannot reach two different conclusions of fact and law . . . , unless these opposite, inconsistent conclusions are reconcilable under an applicable rule of law." *Milliken*, 405 S.W.2d at 477.

The verdict form required the jury to answer a series of questions with respect to fault and damages. The jury found that SmithGroup "breached the applicable standard of care and therefore was at fault" as to all claims. In response to Question 3, the jury also found that TMS was **not** "at fault" with respect to any claims. Yet, in response to Question 4, the jury attributed small percentages of fault to TMS on each claim. And the jury awarded TMS damages on all claims except for the north window wall.

SmithGroup sees two problems with this. First, the jury found TMS both "not at fault" and "at fault" for the same claims. Second, the jury awarded TMS no damages for the north window wall even though it found SmithGroup 70% at fault on that claim. SmithGroup argues that these conflicting findings cannot be logically reconciled. We disagree.

It is our duty to construe the verdict in a manner that upholds the jury's findings if at all possible. *See Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 911 (Tenn. 1999). We strive to give effect to the jury's intent if it is "permissible under the law and ascertainable" from the wording of the verdict. *Hogan v. Doyle*, 768 S.W.2d 259, 263 (Tenn. Ct. App. 1988) (citation omitted).

The jury's conflicting findings on fault may be reconciled using ordinary principles of comparative fault. The jury plainly intended to rule in TMS's favor. It found that SmithGroup breached the standard of care with respect to each claim. And it found that TMS was less than 50% at fault with respect to each claim. Under Tennessee's system of comparative fault, "a plaintiff who is less than fifty percent (50%) at fault may recover damages in an amount reduced by the percentage of fault assigned to the plaintiff." *Ali*, 145 S.W.3d at 561.

The jury's damage assessment also makes sense on these facts. TMS only sought delay damages on the north window wall claim. And Mr. Jones acknowledged that this delay period ran concurrently with the delay for settlement monitoring. The jury assessed $317,340 in delay damages for the settlement monitoring claim. TMS did not seek, nor was it entitled to, a double recovery. *See Ford Motor Co. v. Taylor*, 446 S.W.2d 521, 530 (Tenn. Ct. App. 1969) ("[C]are should be exercised to avoid double recoveries.").

8

## B. Qualifications of Expert Witness

We will not reverse a trial court's decision to admit or exclude an expert witness absent an abuse of discretion. *Freeman v. Blue Ridge Paper Prods., Inc.*, 229 S.W.3d 694, 708 (Tenn. Ct. App. 2007). "A witness may qualify as an expert based upon his or her knowledge, skill, experience, training, or education." *State v. Scott*, 275 S.W.3d 395, 404 (Tenn. 2009) (citing Tenn. R. Evid. 702).

Jerry Clark, an architect with over fifty years of experience, served as TMS's expert witness on the standard of care. SmithGroup argues that Mr. Clark was not qualified to testify as an expert because he was not trained as an engineer and his engineering experience was woefully out-of-date.

Mr. Clark explained that, when he obtained his architectural degree in 1970, architects were considered master builders. He took courses in engineering disciplines for two years as part of his degree program. And for thirty years, he designed a wide variety of buildings using his engineering knowledge. He developed real estate and did his own drainage calculations. He had experience with erosion control, concrete, and asphalt. He understood soil issues. But he conceded that he had not practiced his engineering skills in approximately 20 years. In his words, "the profession has evolved over the past 20 years and the boards have delegated those responsibilities out as projects have become more team oriented and more complex." While he had recently completed a few continuing education courses in civil engineering, he could not explain modern engineering software in any great detail.

We discern no abuse of discretion in allowing Mr. Clark to testify as an expert witness. Mr. Clark had both training and experience in engineering. And he was knowledgeable on the relevant topics. So an engineering degree was not essential. *See Martin v. Sizemore*, 78 S.W.3d 249, 274 (Tenn. Ct. App. 2001) ("[N]othing in Tenn. R. Evid. 702 precludes the introduction and consideration of expert testimony by a witness whose profession differs from the one at issue, as long as the witness can testify authoritatively regarding the applicable standard of care and can explain how the conduct at issue breaches this standard."). Like the trial court, we conclude that SmithGroup's objections go to the weight of Mr. Clark's testimony, not its admissibility. *See Payne v. CSX Transp., Inc.*, 467 S.W.3d 413, 455 (Tenn. 2015) (explaining that "[i]f the expert testimony qualifies as admissible, the trial court's gatekeeping function is completed"); *GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 546 (Tenn. Ct. App. 2005) (finding no abuse of discretion in admission of expert testimony when objections went to the credibility of the expert's opinions); *Bradford v. City of Clarksville*, 885 S.W.2d 78, 83 (Tenn. Ct. App. 1994) (finding no abuse of discretion when objections went to weight).

C.  Material Evidence to Support the Jury Verdict

SmithGroup contends that the evidence at trial does not support a "finding" that it owed TMS a duty of care with respect to settlement monitoring.  Proof of a duty of care is an essential element in a negligence action.  *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993).  Whether a duty of care exists is a question of law for the court.  *Id.*

This is a professional negligence action.  As we perceive the argument, SmithGroup does not dispute that it owed a duty of reasonable care to TMS as the designer and administrator of this project.  Rather, it argues there was no proof at trial that SmithGroup was responsible for the settlement monitoring delay.  Whether SmithGroup's acts or omissions constituted a breach of the applicable standard of care is a question of fact for the jury.  *See McClung v. Delta Square Ltd. P'ship*, 937 S.W.2d 891, 904 (Tenn. 1996) (cautioning that "the question of duty and of whether defendants have breached that duty by taking or not taking certain actions is one for the jury to determine based upon proof presented at trial"); *Dooley v. Everett*, 805 S.W.2d 380, 384 (Tenn. Ct. App. 1990) (explaining that "once a duty is established, the scope of . . . the standard of care is a question of fact").

Our task then is to ascertain whether the record contains any material evidence to support the jury's findings.  *Kelley v. Johns*, 96 S.W.3d 189, 194 (Tenn. Ct. App. 2002). In a material evidence review, we do not reweigh the evidence or re-evaluate witness credibility.  *Grissom v. Metro. Gov't of Nashville, Davidson Cnty.*, 817 S.W.2d 679, 684 (Tenn. Ct. App. 1991).  That is the jury's province.  *Ferguson v. Middle Tenn. State Univ.*, 451 S.W.3d 375, 383-84 (Tenn. 2014).

Whether evidence is material has nothing to do with its weight.  *Kelley*, 96 S.W.3d at 194.  "Material evidence" is evidence "which must necessarily enter into the consideration of the controversy and by itself, or in connection with the other evidence, be determinative of the case."  *Meals ex rel. Meals v. Ford Motor Co.*, 417 S.W.3d 414, 422 (Tenn. 2013) (quoting *Knoxville Traction Co. v. Brown*, 89 S.W. 319, 321 (Tenn. 1905)). We take the strongest legitimate view of the evidence supporting the verdict, including all reasonable inferences, assume the truth of the supporting evidence, and discard all countervailing evidence.  *Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978).  If there is any material evidence to support the verdict, we must affirm.  *Id.*

1. Breach of the Applicable Standard of Care

SmithGroup insists that there is no material evidence to support the jury's finding of liability on the settlement monitoring claim.  Ms. Fink claimed that Earth Science recommended settlement monitoring, evaluated the monitoring data, and decided when

construction of the plaza could move forward.[3]   Even so, "determining whether a professional's conduct complies with the applicable standard of care" requires expert testimony. *Martin*, 78 S.W.3d at 272; *Dooley*, 805 S.W.2d at 384-85 ("Professionals are judged according to the standard of care required by their profession."). Ms. Fink was not an expert witness. Mr. Clark was.

Mr. Clark recognized Earth Science's role on this project.  But he maintained that SmithGroup, as the design professional, was ultimately responsible for deciding how to design the plaza in light of the instability of the soil.  Simply accepting the geotechnical firm's recommendation, without more, was a breach of the standard of care.  In his opinion, SmithGroup should have considered other options.  At a minimum, SmithGroup should have considered the impact on the project as a whole of an extended delay for settlement monitoring.

SmithGroup argues that Mr. Clark's mistaken belief that SmithGroup retained Earth Science as a consultant, not the City, "undermines the weight and credibility" of his opinions.  When confronted with his mistake, Mr. Clark maintained that it did not affect his opinion.  And we will not reweigh the evidence or re-evaluate Mr. Clark's credibility on appeal. *See Grissom*, 817 S.W.2d at 684.

Material evidence also supports the jury's findings that SmithGroup breached the applicable standard of care with respect to the remaining claims.[4]  In arguing otherwise, SmithGroup emphasizes its own proof and various perceived deficiencies in TMS's evidence.  But we view the evidence in a different light. *See Crabtree Masonry Co.*, 575 S.W.2d at 5.

Mr. Spigner and Mr. Jones recounted the problems TMS encountered with stormwater runoff and erosion on the job site.  They claimed that none of the erosion controls the contractor installed were effective.  The water velocity was overwhelming. Mr. Clark opined that SmithGroup's erosion control plan failed to properly account for these high velocities.  In his opinion, "that was a design responsibility and not a construction responsibility."

Mr. Spigner and Mr. Jones acknowledged that the concrete connections did not meet the contract specifications.  Yet they claimed that the cold-joint connections were equally durable.  Mr. Clark agreed.  He explained that the administrator of a construction project

_____

[3] Some evidence in the record suggests that SmithGroup may have had more involvement than Ms. Fink indicated.  On January 13, 2012, Mr. Jones received an email message from SmithGroup that provided: "In discussions with the City and Earth Science Engineering earlier this week, we **jointly decided** to cease settlement monitoring of the Liberty Plaza."

[4] SmithGroup does not dispute the jury's finding that it breached the standard of care with respect to the north window wall.

11

had a duty to act reasonably. Yet SmithGroup required the contractor to remove and replace extensive amounts of concrete for mere aesthetics. The repair work was expensive, and it damaged the adjacent landscaping. In Mr. Clark's opinion, SmithGroup's decision was unreasonable under the circumstances.

Similarly, SmithGroup recommended that the City pay TMS for resurfacing two-thirds of the asphalt trails. TMS used the specified binder mix for the asphalt walking trails. The City was not happy with the appearance of the trails. TMS added a tennis court resurfacer to all the trails at the City's request. Mr. Clark opined that SmithGroup's recommendation breached the standard of care. It should have recommended that the City pay TMS a fair price for its work.

2. Damages for Delay

SmithGroup asserts that there is no material evidence to support the jury's finding that TMS was damaged by the settlement monitoring delay. But Mr. Spigner testified to the work in the plaza area that was on hold during the delay period. When the initial 60-day monitoring period ended, TMS was "all but finished with the rest of the project." Mr. Spigner and Mr. Jones asserted that, for the most part, the contractor was working on punch-list items in the rest of the park. The only significant outstanding work was in the plaza area. And it cost TMS money to remain on site every day.

Damages for delay can include increased overhead and other costs "that can reasonably be attributed to the performance of the work that was delayed." *Moore Const. Co., Inc. v. Clarksville Dep't of Elec.*, 707 S.W.2d 1, 15 (Tenn. Ct. App. 1985). Mr. Jones claimed that it cost $2,604 for TMS to be on site each day during this delay period. He calculated that number based on the costs directly attributable to oversight or day-to-day operations for the outstanding jobs. A properly authenticated business record summary supporting his calculations was admitted into evidence without objection. He maintained that the outstanding work in the plaza area prevented TMS from "cross[ing] items off the list." So TMS was unable to reduce its overhead costs during the delay period.

SmithGroup questions Mr. Jones's calculations, claiming that he did not account for the work being done elsewhere on the project. Mr. Jones and Mr. Spigner maintained that only minor work was being done elsewhere on the project during this period. The jury was entitled to believe their testimony. Even so, the jury appears to have taken SmithGroup's objections into consideration. Mr. Jones claimed that TMS sustained $423,120 in damages for this delay period. The jury only awarded $317,340.

## III.

We conclude that SmithGroup is not entitled to a new trial. Based on Mr. Clark's training and experience in engineering, we discern no abuse of discretion in the court's

decision to admit him as an expert witness. The jury's findings were supported by material evidence in the record. And the trial court properly reconciled the inconsistencies in the jury verdict. So we affirm the trial court's judgment in all respects.

_____ s/ W. Neal McBrayer _____
W. NEAL MCBRAYER, JUDGE